**GEORGIA–PACIFIC CORP., Plaintiff,**

v.

**FIRST WISCONSIN FINANCIAL CORP., Defendant.**

Nos. 82 C 6768, 82 C 4531.

United States District Court,
N.D. Illinois, E.D.

Sept. 27, 1985.

William I. Goldberg, Timothy F. Kocian, Melanie Rovner Cohn, Antonow & Fink, Chicago, Ill., Fred R. McMorris, Wheaton, Ill., for DuPage Lumber, West DuPage, and James Green, Ronald Wilder, Ann Rae Heitland, Sara L. Johnson.

Schiff, Hardin, & Waite, Chicago, Ill., for Georgia-Pacific Corp.

Terry F. Moritz, Alan P. Solow, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, Ill., for First Wis.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

These cases, consolidated for pre-trial purposes, are before the court on several motions. In 82 C 6768, plaintiff Georgia-Pacific Corporation ("Georgia-Pacific") has moved under Fed.R.Civ.P. 12(c) for judgment on the pleadings in its favor on the Amended Counterclaim of defendant First Wisconsin Financial Corporation ("First Wisconsin"). First Wisconsin has moved for the release of certain funds held by the Clerk of Court, and Georgia-Pacific has moved to require that all funds collected by First Wisconsin be deposited with the court. In 82 C 4531, Georgia-Pacific has moved for judgment on the pleadings in its favor on the Amended Complaint of DuPage Lumber and Home Improvement Co. ("DuPage"). Federal subject matter jurisdiction is based on 28 U.S.C. § 1332, the parties being of diverse citizenship and the amount in controversy exceeding $10,000.

## FACTS

For purposes of Georgia-Pacific's motions for judgment on the pleadings, all well-pleaded factual allegations of DuPage's Amended Complaint and First Wisconsin's Amended Counterclaim must be taken as true, and all of Georgia-Pacific's allegations which have been denied must be taken as false. *Chi-Mil Corp. v. W.T. Grant Co.*, 70 F.R.D. 352, 358 (E.D.Wis. 1976). In addition, nonmovants DuPage and First Wisconsin must be entitled to all reasonable inferences in their favor based on the facts as alleged. *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir.1980). Because of the related nature of the two claims, a single factual summary will suffice.

Beginning in 1972 Georgia-Pacific and DuPage entered into a consecutive series of agreements whereby DuPage purchased lumber and other building materials from Georgia-Pacific. It was the custom and understanding of the parties that Georgia-Pacific would ship the items ordered to DuPage's business location and that DuPage would commingle the items into its general inventory. Throughout this period and continuing through June 1982, DuPage generally sold materials from its inventory in the order in which they were received.

During this period, all of DuPage's purchases were made on open account, with the amount to be paid each month to be

determined by DuPage based upon its cash flow. DuPage maintained an unpaid balance at all times for orders which it had already received, and Georgia-Pacific never charged DuPage interest on the unpaid balance of its account.

On or about August 1, 1977, DuPage and Georgia-Pacific entered into a security agreement wherein DuPage granted Georgia-Pacific a security interest in DuPage's inventory and accounts receivable. An identical security agreement was signed by the parties on or about March 16, 1979. The security agreements provided that DuPage would give or file appropriate lien notices, claims of lien and notices on bonds whenever such a lien or bond was obtainable, and would execute written assignments from time to time as would be necessary to protect Georgia-Pacific's interest in such liens or claims. Nothing in the written agreement either authorizes or prohibits Georgia-Pacific's filing lien notices in its own name.

On or about October 27, 1978, DuPage entered into a Receivables and Inventory Loan and Security Agreement with First Wisconsin. As security for the loans, DuPage granted to First Wisconsin a security interest in all of DuPage's existing and future accounts receivable and all proceeds thereof. Under the loan agreement, DuPage was required to remit all proceeds to First Wisconsin promptly upon their receipt by DuPage.

In order to induce First Wisconsin to make and renew loans and to extend further credit to DuPage, Georgia-Pacific entered into a subordination agreement with First Wisconsin. Under the agreement, Georgia-Pacific agreed to subordinate any security interest it then held or thereafter acquired in DuPage's inventory, accounts receivable, and proceeds thereof, and to subrogate First Wisconsin to any and all of Georgia-Pacific's "rights, title and interest" in that property. Georgia-Pacific further authorized First Wisconsin to collect, receive, enforce and accept any and all sums that became due with respect to such property, provided, however, that nothing in the agreement be construed to prevent Georgia-Pacific from demanding payment of DuPage's debts in the ordinary course of business.

Both prior to and after the signing of the security agreements, DuPage served lien notices and filed lien claims from time to time within its sole discretion. Georgia-Pacific never objected to DuPage's practices regarding the serving of lien notices or the filing of lien claims, Georgia-Pacific never objected to DuPage's failure to enforce a lien against a particular customer or project, and Georgia-Pacific never served any lien notices on a customer or project to which DuPage had supplied materials.

In or about January 1982, Georgia-Pacific informed DuPage that it wanted DuPage to pay off the balance on its account, at that time approximately $400,000. During the next several months, DuPage made reasonable attempts in good faith to reduce the balance of its account, but was unable to satisfy Georgia-Pacific. Throughout these months, Georgia-Pacific continued to sell to DuPage.

At a meeting on or about June 29, 1982, Georgia-Pacific demanded payment of the balance of DuPage's account and advised DuPage that it would no longer sell to DuPage. At this meeting, Georgia-Pacific, through its attorneys, Schiff, Hardin & Waite ("Schiff"), also requested information on DuPage's customers and accounts receivable. DuPage provided Georgia-Pacific with its latest itemized statement of accounts receivable, including the names of DuPage's customers, the names or addresses of those customers' construction projects, and the dollar amounts of the accounts.

On or about July 5, 1982, Georgia-Pacific requested DuPage to make two July payments. DuPage advised Georgia-Pacific that it could not make the first payment because of the interest due on the loan from First Wisconsin, but that it would make the second payment of $160,000 in late July, 1982. Thereafter, commencing on or about July 13, Georgia-Pacific, through its attorney Ronald Wilder at

Schiff, prepared and distributed purported subcontractor's lien notices to DuPage's largest dollar volume customers. This was done without the advice or consent of either DuPage or First Wisconsin. Each of these lien notices falsely stated that DuPage had hired Georgia-Pacific to supply lumber and other building materials to the construction projects of these customers, whereas in reality DuPage had hired Georgia-Pacific to furnish these materials on open account. Each lien notice also stated falsely that $392,335.09 was due Georgia-Pacific on its contract with DuPage for furnishing materials to that particular owner's site. In fact, $392,335.09 represented DuPage's total indebtedness to Georgia-Pacific so that the lien notices in the aggregate claimed a debt vastly in excess of the actual amount owed. Georgia-Pacific made no effort to determine what, if any, materials sold by DuPage to the notice recipients had come from Georgia-Pacific.

Following the distribution of these lien notices, DuPage was deluged with calls from the recipients that they would not pay their bills, which aggregated more than $1 million, and would not make further purchases from DuPage. As a further result of Georgia-Pacific's actions, First Wisconsin declared DuPage in default on the loan agreement, demanded payment of the approximately $1.2 million loan and surrender of DuPage's accounts receivable and inventory, began dishonoring checks presented for payment on DuPage's account, and refused to advance funds under the loan which were essential to DuPage's continued business operations.

On July 21, 1982, DuPage filed its original complaint in 82 C 4531, seeking damages and a temporary restraining order against further distribution of said lien notices. On July 22, outside the courtroom in which a preliminary injunction hearing was held, attorney Ronald Wilder informed Jim Green, president of DuPage, that he was going to put DuPage out of business and take all of its inventory. On July 23, 1982, Judge Grady granted DuPage a preliminary injunction against further distribution of notices and First Wisconsin rescinded its notice of default. On July 28, Georgia-Pacific exercised its election to terminate the subordination agreement. As a result of these actions, First Wisconsin again declared a default and demanded payment of the loan to DuPage. On July 30, 1982, DuPage filed for reorganization under Chapter 11 of the Bankruptcy Code.[1]

According to the pleadings of both First Wisconsin and DuPage, the above actions of Georgia-Pacific were undertaken in bad faith with the intention of injuring DuPage's relations with its customers and thereby driving it into liquidation. DuPage and First Wisconsin also allege that Georgia-Pacific's actions were intended to interfere with the loan agreement between the two of them. On October 25, 1983, in a partly published decision,[2] this court held that DuPage had stated a claim for breach of contract, but dismissed DuPage's claims for tortious interference with business relations and abuse of process and dismissed First Wisconsin's claims for breach of contract and tortious interference with contract. Both parties were subsequently given leave to file amended pleadings to cure

1. Georgia-Pacific has also presented in connection with its motion numerous admissions made by DuPage president, director, and 50% shareholder James R. Green, on the ground that consideration of such materials is proper if the court converts Georgia-Pacific's Rule 12 motion into one for summary judgment under Rule 56. DuPage has objected to the inclusion of this material outside the pleadings, and has requested an opportunity to conduct further discovery if the court intends to enter judgment under Rule 56. The extraneous materials presented by Georgia-Pacific do little more than flesh out the particular financial troubles DuPage was having in making payments despite Georgia-Pacific's

demands that DuPage bring its account current. The court will accordingly refer to those materials from time to time for purposes of clarity but will rule on the motion as one under Rule 12, since that is the form under which it was presented.

2. At the request of the parties, the court submitted for publication its discussion of Georgia-Pacific's claim for equitable marshalling. That opinion is reported at 34 B.R. 737 (N.D.Ill.1983). The portions of the opinion relevant to the present motion were not published.

the deficiencies. Those amended pleadings are the subject of the present motion.

In its Amended Complaint in 82 C 4531, DuPage asserts the following claims: 1) breach of contract under Georgia-Pacific's agreements with DuPage; 2) third-party beneficiary claim for Georgia-Pacific's breach of the subordination agreement with First Wisconsin; 3) intentional interference with business relationships and expectancies; and 4) defamation. In its Amended Counterclaim in 82 C 6768, First Wisconsin asserts only a claim for tortious interference. Georgia-Pacific has moved for judgment on all claims.

## MOTION FOR JUDGMENT
## UNDER RULE 12(C)

### I. Breach of Contract

#### a. Sales Agreement

DuPage alleges that Georgia-Pacific's distribution of lien notices breached its agreements with DuPage. Specifically, DuPage alleges that a part of the sales agreement between Georgia-Pacific and DuPage was that DuPage would serve lien notices and file lien claims in its sole discretion, and Georgia-Pacific would not assert liens against properties for which DuPage had supplied building materials. On October 25, 1983, this court sustained DuPage's allegations based on this alleged course of dealing.

This course of dealing is reflected in paragraph 7(b) of the Security Agreement:

Debtor [DuPage] shall give or file appropriate lien notices, claims of lien and notices on bonds whenever such a lien is obtainable or a bond, public or private, is available and shall execute written assignments from time to time as may be necessary to perfect Secured Party's [Georgia-Pacific's] interest in such liens or claims.

DuPage relies on the above language to indicate both that the agreement contemplated all lien notices to be filed by DuPage, and that DuPage would only make assignments of its lien rights on a case-by-case basis following some communication from Georgia-Pacific. Georgia-Pacific, in contrast, stresses that this language merely obliges DuPage to take certain steps [which DuPage apparently did not do] while not restricting Georgia-Pacific's rights in any way.

To support its position, Georgia-Pacific relies on paragraphs 10, 11 and 14 of the Agreement. Paragraph 10 provides that "All remedies of Secured Party [Georgia-Pacific] shall be cumulative." Paragraph 11 provides that "Waiver of any provision hereof in any instance shall not be deemed to be a waiver of any other or future breach of the same or any other provision." Paragraph 14, finally, provides that Georgia-Pacific "shall have no duty ... to realize on the collateral in any particular manner or seek reimbursement from any particular source." Georgia-Pacific argues that the combined force of these paragraphs give it an express right to assert *any* legal remedies it might have as a creditor, including mechanics' liens, and that DuPage should therefore not be allowed to rely on a prior course of dealing inconsistent with the express language of the contract.

Because jurisdiction in this case rests on diversity, this court must apply the choice-of-law rules of the forum state. The parties agree that the contracts at issue were executed here, that all other events took place in Illinois, and that Illinois law therefore governs. Under the Illinois Commercial Code, Ill.Rev.Stat. ch. 26, § 1–205(4), "The express terms of an agreement and applicable course of dealing ... shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable express terms control...." Section 2–208(2) of the Code similarly provides that contractual language and course of performance "shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance...."

The above provisions must also be read in light of §§ 1–205(1) and 2–208(1). Section 1–205(1) defines a course of dealing as

"a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding in interpreting their expressions and other conduct." Section 2–208(1) establishes the relevancy of prior conduct as a tool to contract interpretation: "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." In commenting on the incorporation of the Uniform Commercial Code into Illinois law, the legislative draftsmen expressly noted that this latter provision accords with prior Illinois case law. *See* Illinois Code Comment, Ill.Ann.Stat., ch. 26, § 2–208, at p. 155.

As the above statutory provisions make clear, DuPage's allegations of a contract based on a course of dealing must be accepted unless those allegations cannot reasonably be construed as consistent with the express language of the security agreement. Georgia-Pacific contends that an express contradiction exists between the language of the agreement and the course of dealing alleged by DuPage, and that the express terms override any alleged course of dealing. Both the applicable rules of contract construction and the procedural posture of this motion compel the court to reject this argument.

■ The court begins by noting that Paragraph 7(b) of the contract provides for DuPage, not Georgia-Pacific, to give or file appropriate lien notices and claims of lien "whenever such a lien is obtainable" and to "execute written assignments from time to time as may be necessary to perfect Secured Party's interest in such liens or claims." While such language refers to DuPage's obligations, and neither limits

Georgia-Pacific's rights nor requires Georgia-Pacific to do anything, the contractual language nonetheless envisions a course of dealing where DuPage rather than Georgia-Pacific had a responsibility for filing lien notices. It does not contradict this language for DuPage to allege that Georgia-Pacific had no right to assert liens in DuPage's stead. Such a construction is further buttressed by the alleged fact that, before sending notices itself, Georgia-Pacific never complained of DuPage's failure to perfect liens, and never declared a default based on DuPage's inaction with respect to such liens.

Georgia-Pacific argues that DuPage's allegations are nonetheless inconsistent with the language of paragraphs 10, 11 and 14. When viewed in context, however, these provisions neither singly nor in combination contradict the prior course of practice on which DuPage relies. Paragraph 10 reads in its entirety as follows:

> Upon the occurrence of any event of default, Secured Party may, at its option and without prior notice, declare any obligation of Debtor secured by this Agreement immediately due and payable and shall have and may exercise each and all of the rights and remedies available to Secured Party for the foreclosure of security interests in collateral under the Uniform Commercial Code. All remedies of Secured Party shall be cumulative.

In reliance on the final sentence of this paragraph, Georgia-Pacific argues that it retained all mechanics' lien rights. Looked at in context, however, the reference to cumulative remedies reasonably might be construed to encompass only remedies arising under the U.C.C. for foreclosure of security interests. A prior course of dealing is therefore relevant in determining whether that paragraph extended to mechanics' lien remedies, which are expressly excluded from the Uniform Commercial Code. § 9–104(c).[3] Construing all facts

3. Although DuPage has not raised this argument, extrinsic evidence might also be admissible to determine whether the "without prior notice" language of paragraph 10 refers to exercise of these remedies or only to the declaration of default. DuPage might successfully argue that Georgia-Pacific's service of lien notices without a formal declaration of default amount-

and making all inferences in DuPage's favor, the court cannot say that plaintiff beyond doubt is incapable of proving an entitlement to relief, particularly where Illinois law requires that the contract be construed to accord with prior practice wherever possible.

For similar reasons, the court finds Georgia-Pacific's invocation of paragraphs 11 and 14 unpersuasive. Paragraph 11, which makes clear that waiver of a contractual provision on one occasion ˝shall not be deemed to be a waiver of the same provision in the future, has no applicability where the course of dealing alleged by DuPage is relevant to construction of the contract and not to a purported waiver. Paragraph 14, which relieves Georgia-Pacific from any duty "to realize on the collateral in any particular manner," might arguably be construed to exonerate Georgia-Pacific from deficiencies in the manner by which it sent mechanics' lien notices. Again, however, the prior course of dealing is relevant to determine whether the above provision should be limited to the context of foreclosure within the provisions of Article 9 of the U.C.C.; the sending of lien notices is not necessarily equivalent to a realization on collateral. While the court views Georgia-Pacific's reliance on paragraph 14 as potentially a strong defense, the court cannot accept that defense as sufficient on a motion for judgment on the pleadings.

### b. Duty of Good Faith and Fair Dealing

Even were the court to find that paragraph 14 of the agreement shielded Georgia-Pacific from liability for any deficiencies stemming from its attempts to realize on collateral through the sending of lien notices, judgment on the pleadings would still be unavailable in this case. DuPage has alleged that Georgia-Pacific sent out the lien notices in bad faith for the purpose of injuring DuPage's ˙ relations with its customers and with the intent of

forcing DuPage into liquidation, and that Georgia-Pacific breached its contractual duties of fair dealing and commercial reasonableness in so doing. Both Illinois case law and the U.C.C. imply such a duty of good faith in every contract. *Spircoff v. Spircoff,* 74 Ill.App.3d 119, 29 Ill.Dec. 806, 812, 392 N.E.2d 363, 369 (1st Dist.1979); Ill.Rev.Stat. ch. 26, § 1–203. *See also* Ill. Rev.Stat. ch. 26, § 9–502(2) (secured creditor "who undertakes to collect from ... account debtors must proceed in a commercially reasonable manner.") DuPage has adequately alleged a breach of contract based on the *manner* in which Georgia-Pacific distributed the lien notices, regardless of Georgia-Pacific's actual right to send such notices.

Georgia-Pacific has strenuously challenged the sufficiency of DuPage's allegations as to both commercial unreasonableness and bad faith. The crux of Georgia-Pacific's argument is that it has statutory lien rights under the Mechanics' Lien Act, both as an assignee of DuPage's accounts receivable, and as a materialman supplying materials to a contractor or subcontractor, and that its actions were therefore reasonable as a matter of law.

Whether or not Georgia-Pacific's lien would have been enforceable under the Illinois Mechanics' Lien Act is not directly relevant to DuPage's breach of contract claim, but does shed light on the alleged unreasonableness with which Georgia-Pacific acted. Georgia-Pacific argues that the Security Agreement operated as an assignment of DuPage's lien rights, by analogy to the fundamental principle that an obligation and its security shall not be separated. *Restatement of Security,* §§ 29 and 67 (1941). Georgia-Pacific also notes that, under the Uniform Commercial Code, no distinction exists between the assignee of accounts receivable and a secured creditor with an interest in those accounts. *Western Decor & Furnishings Industries, Inc.*

ed to a contractual breach. Obviously, the success of this argument depends on whether Georgia-Pacific did declare a default (the facts suggest not but are unclear), since DuPage's failure

to preserve liens could have been declared a default on its obligation to file appropriate lien notices whenever such liens were obtainable.

*v. Bank of America National Trust & Savings Ass'n,* 91 Cal.App.3d 293, 302, 154 Cal.Rptr. 287, 291–92 (1979).

The applicability of this rule to the present case must be questioned. The court has already determined that a factual dispute exists as to whether DuPage and Georgia-Pacific intended through their course of dealing to vest sole responsibility for enforcing mechanics' liens with Du-Page. The contract provides that DuPage shall not only file appropriate lien notices but also "shall execute written assignments from time to time as may be necessary to perfect Secured Party's interest in such liens or claims." While this language appears to be boilerplate, the contract arguably indicates that something less than a full assignment was contemplated.

■ That Georgia-Pacific might for other purposes be deemed an assignee of the accounts receivable does not change this result. *Western Decor,* which directly supports Georgia-Pacific's position, addresses the distinction between assignees and secured creditors for purposes of applying U.C.C. § 9–502, not for determining mechanics' lien rights. *A.J. Armstrong Co., Inc. v. Janburt Embroidery Corp.,* 97 N.J. Super. 246, 234 A.2d 737, 743 (1967), on which Georgia-Pacific also relies, indicates that the assignee of chattel paper may be treated as a secured party under § 9–502 but does not address whether a secured party must for all purposes be treated as an absolute assignee. The other authority relied on by Georgia-Pacific, 53 Am.Jur.2d *Mechanics' Liens* § 284, speaks only of the "assignment of a contract on which labor

has been performed" and not the assignment of accounts receivable as security for a debt. In view of DuPage's allegations that it intended less than a complete assignment, and bearing in mind that mechanics' liens are personal in nature and are not as easily assignable as perfected security interests in many jurisdictions, 53 Am.Jur.2d *Mechanics' Liens* § 79, the court cannot say that DuPage's grant of a security interest in its accounts receivable operates as a matter of law to assign its statutory lien rights.[4]

Georgia-Pacific also argues that it had lien rights by virtue of its position as a supplier of building materials to DuPage. The Illinois Mechanics' Lien Statute, Ill. Rev.Stat., ch. 82, defines "contractor" as any person who contracts with an owner of land to improve the land or furnish material for it. Section 21, in turn, provides that persons who furnish materials to the contractor shall be known as sub-contractors and have enforceable lien rights. Section 22 then provides that when a contractor sublets his contract or a specific portion thereof to a subcontractor, the party furnishing material for such subcontractor shall also have enforceable lien rights.

■ Georgia-Pacific is theoretically entitled to independent lien rights in one of two ways. First, if DuPage's customer were a builder who owned the lot in question, then DuPage might be a contractor, and Georgia-Pacific would have lien rights under § 21 as one who furnishes building materials directly to a contractor. If, on the other hand, DuPage's customer were a con-

---

4. Mechanics' liens are assignable in Illinois, Ill. Rev.Stat., ch. 82, § 8, and it therefore appears that the intent of the parties will control whether an assignment occurred in this case. It should be noted, however, that some states distinguish between already perfected liens and the right to perfect a mechanic's lien for purposes of assignability. *See, e.g., Talco Capital Corp. v. State Underground Parking Commission,* 41 Ohio App.2d 171, 324 N.E.2d 762, 767 (1974) (perfected liens are assignable but right to perfect is a personal statutory right). The court expresses no opinion as to whether this distinction would apply in Illinois, but has assumed for purposes of this opinion that it would not.

*Cf. Boyer v. Keller,* 258 Ill. 106, 115–16, 101 N.E. 237 (1913) (successor corporation allowed to file claim for lien where claim was properly assigned). Georgia-Pacific has also argued, by reference to the deposition of Jim Green, that DuPage's refusal to give assignments should estop DuPage from denying an assignment now. Even were this court treating the motion as one under Rule 56, the court finds the single instance referred to in that deposition excerpt insufficient for establishing the kind of behavior that would justify an estoppel, and questions whether such behavior would in any event allow invocation of this rule.

tractor and sub-let a portion of his contract to DuPage, then Georgia Pacific would have rights as a supplier to a sub-contractor under § 22.[5] But the fact that Georgia-Pacific "might have had" lien rights under either of these sections does not make its actions reasonable as a matter of law. The record leaves unanswered what Georgia-Pacific knew or reasonably believed at the time it sent out the lien notices, and DuPage's complaint suggests that DuPage was itself a supplier of building materials to contractors, rather than a contractor or subcontractor, within the meaning of the Mechanics' Lien Act.

The reasonableness of Georgia-Pacific's notices must also be weighed in light of its ongoing business relationship with DuPage, whereby all goods were sold on open account without reference to the particular lots upon which such materials would be used, or which customers would purchase the goods. Georgia-Pacific argues that selling on open account does not bar a supplier from asserting mechanics' liens. The authority cited by DuPage to rebut this argument—*Davis v. Willmoore*, 186 Ill.App. 510 (4th Dist.1914)—does not reach the issue. In that case, as is evident from the full unpublished opinion, the owner sought to defeat a mechanic's lien on the ground that the material had been furnished in an open account transaction. The court, without comment on the relevance of the defense, simply found the evidence to suggest otherwise.

Georgia-Pacific cites *Nielsen v. Enchius*, 212 Ill.App. 409, 411 (1st Dist.1918), as authority that open account creditors can also assert mechanics' liens. In that case the owner raised the same defense that the owner had argued in *Davis*. The court of appeals noted in passing that the material had been sold on thirty days' credit, but found this insufficient in and of itself to defeat the lien. The court never addressed whether or not the materials were sold

with reference to a particular building project, and thus *Nielsen*, like *Davis*, cannot fully resolve the present issue.

■ Generally, mechanics' liens statutes permitting liens for those who furnish building materials "apply only to a furnishing for building purposes, and do not include a furnishing for general or unknown purposes, or an ordinary sale in the usual course of trade or on a general open account, or a sale without any reference as to what shall be done with the material sold." 53 Am.Jur.2d, *Mechanics' Liens* § 101, at p. 613. The apparent rationale for this rule is that a supplier who sells materials without understanding that they are to be used in the erection or repair of a building "relies exclusively upon the credit of the buyer and takes no security." *Id. See also* 57 C.J.S. *Mechanics' Liens* § 45, at p. 538 ("it is essential that the materials shall have been sold or furnished for the purpose of being used in the particular building on which a lien is claimed ..."); *Illinois Institute of Continuing Legal Education, Illinois Mechanics' Liens* (1981) (citing *Davis v. Willmoore* as authority that subcontractor who periodically delivers material on open account cannot be held a subcontractor on any particular job). As Judge Grady found in the original preliminary injunction hearing in this matter, Georgia-Pacific's attempt to send out liens in gross for a variety of projects in which materials it supplied might have been used is an unusual if not unprecedented use of the Lien Act. (Transcript of Proceedings in No. 82 C 4531, July 23, 1982). The court certainly cannot hold such conduct reasonable as a matter of law.

A case somewhat similar to the present one is *Pedi Bares v. First National Bank of Neodesha*, 223 Kan. 477, 575 P.2d 507 (1978). In that case, the defendant owned a security interest in the plaintiff's accounts receivable, and was authorized by

---

**5.** Georgia-Pacific has argued that the statute gives enforceable lien rights to persons who furnish materials generally to subcontractors as well as those who furnish directly to contractors. On its face, however, § 22 extends lien rights to suppliers of subcontractors only where the subcontractor acts pursuant to a specific sublease of the contract. Whether those circumstances apply to the present case has not been addressed by the parties.

contract to contact the plaintiff's account debtors for purposes of inquiring into the status of the accounts. The defendant sent letters to several of plaintiff's customers in which it informed them of its interest, amounts shown to be owed, and requested remittance of checks made payable jointly to it and plaintiff. Apparently, some of these letters were incorrectly sent to customers whose accounts were fully paid, and the plaintiff alleged that the defendant's acts were undertaken in bad faith to drive it out of business. The court found that whether the letters were commercially reasonable under the circumstances or were sent in bad faith were questions of disputed fact to be resolved at trial.

Georgia-Pacific argues that *Pedi Bares* is distinguishable since the defendant in that case had not voiced any prior concern over the status of plaintiff's loans, clearly violated the terms of its contract by requesting payment, and lacked a *bona fide* claim. Even more than in *Pedi Bares,* however, the allegations and evidence of bad faith in this case cannot be summarily rejected. Not only are there serious questions about Georgia-Pacific's contractual right to send lien notices, but every lien notice states that Georgia-Pacific had been hired by DuPage to furnish building materials to the jobsite in question and that there was due "therefore" $392,335: such assertions if read literally are patently false. While Georgia-Pacific is not legally obliged to determine the exact indebtedness of each property, *see First Federal Savings & Loan Association v. Connelly,* 97 Ill.2d 242, 73 Ill.Dec. 454, 454 N.E.2d 314 (1983), the notices in that case correctly described the debt as accruing on several contracts, so that no recipient was charged with the full debt. Georgia-Pacific's assertion that the lien notices properly stated the amount due cannot be sustained on a Rule 12 motion where the lien notices inaccurately designate the source of the debt, and where each lien notice ascribes the same debt as owing on a different contract. *Cf. Fedco Electric Co., Inc. v. Stunkel,* 77 Ill.App.3d 48, 32 Ill.Dec. 735, 395 N.E.2d 1116 (4th Dist.1979) (appellate court noted

that a $3,000 claim on a $1,400 debt might be so excessive in amount that it could not be considered "a mere mistake or an error.")

Finally, DuPage's allegations that Georgia-Pacific's true intent in sending the notices was to drive DuPage out of business and not to assert bona fide liens is supported by attorney Ronald Wilder's statement during July of 1982, after court proceedings had begun, that Georgia-Pacific was going to put DuPage into liquidation. Georgia-Pacific has asked the court to disregard these allegations, since it was clearly contrary to Georgia-Pacific's interests to force DuPage into liquidation, and since attorney Wilder's statement is readily explained as a statement of Georgia-Pacific's right to foreclose on its collateral. Georgia-Pacific argues that the "only reasonable inference to be drawn" from DuPage's allegations is that Georgia-Pacific sent lien notices to secure its claims, and that DuPage's allegations concerning Wilder's statement amount to a "desperate" attempt to bolster its allegations of malice.

The court agrees that putting DuPage out of business would have been (and was) against Georgia-Pacific's business interests, and that an attorney's statement during the heat of courtroom proceedings is not overwhelming evidence of Georgia-Pacific's intent in sending statutory lien notices. Wilder's statement is ambiguous evidence of bad faith in any event. But the court cannot disregard these allegations. The lapse of time between the sending of the notices and the remark is less than two weeks, and Wilder was the attorney who signed the lien notices.

Even were the court to disregard Wilder's statement, it is not patently unreasonable to assume, as DuPage has alleged, that Georgia-Pacific chose deliberately improper means of collection in order to put coercive economic pressure on DuPage. According to DuPage's Complaint, Exhibit D (the statement of accounts which Georgia-Pacific used in sending out the lien notices), many if not all of the customers to whom Georgia-Pacific sent notices owed

significantly less than $392,000 to DuPage. Such account debtors would no doubt be frightened to learn that DuPage had potentially subjected them to lien liability vastly in excess of their debts, would question DuPage's business practices as a result, and would conceivably cease doing business with DuPage.[6] These consequences are not so improbable that Georgia-Pacific might not have foreseen them in its decision to send out liens in gross for its entire debt, and might not have hoped to gain some advantage from the threat that such business disruption would bring to bear upon DuPage. While the court expresses no opinion as to the result were discovery completed and Georgia-Pacific moving under Rule 56, the motion for judgment on the pleadings as to DuPage's contract claims of bad faith and unfair dealing must be denied.

### c. Breach of Subordination Agreement

■ In order to state a further breach of contract claim, DuPage asserts that it is a third party beneficiary of the Subordination Agreement between First Wisconsin and Georgia-Pacific, and that Georgia-Pacific breached that agreement. Georgia-Pacific has moved to dismiss this claim for lack of standing, and for failure to allege a breach. The court agrees that DuPage lacks standing to sue on the Subordination Agreement as alleged, and has not properly alleged a breach in any event.

The classic statement of the Illinois rule regarding the rights of a third-party beneficiary to sue on a contract is found in *Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 257–58, 178 N.E. 498, 501 (1931):

The rule is settled in this state that, if a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct he may sue on the contract; if incidental he has no right of recovery thereon.

*Accord, People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.,* 78 Ill.2d 381, 36 Ill.Dec. 338, 339, 400 N.E.2d 918, 919 (1980); *Midwest Concrete Products Co. v. LaSalle National Bank,* 94 Ill.App.3d 394, 49 Ill.Dec. 968, 969, 418 N.E.2d 988, 989 (1st Dist.1981).

Whether a party is a third-party beneficiary to a contract depends upon the intent of the parties and must therefore be determined on a case-by-case basis. *Midwest Concrete Products,* 49 Ill.Dec. at 970, 418 N.E.2d at 990. However, at the same time, the Illinois courts have repeatedly recognized that the liability of the promisor to the third party must "affirmatively appear from the language of the instrument when properly interpreted and construed." *Carson Pirie Scott,* 346 Ill. at 258, 178 N.E. at 501. *Accord, Resnik,* 36 Ill.Dec. at 339, 400 N.E. at 919; *Midwest Concrete Products,* 49 Ill.Dec. at 970, 418 N.E.2d at 990.

A consideration of the entire contract and the circumstances surrounding the parties does not reveal an intent to benefit DuPage directly. While the contract was entered into "in order to induce" First Wisconsin "to make and renew loans and extend credit to" DuPage, and purports on the final page to "inure to the benefit" of DuPage, the Subordination Agreement con-

---

**6.** Georgia-Pacific correctly argues in its reply memorandum that overcharging in a notice or claim of mechanics' lien does not defeat the claim unless it be shown that "such error or overstatement is made with intent to defraud." Ill.Rev.Stat., ch. 82, § 7. The cases bear out that overstatements of charges are tolerated since the recipients of the notices can easily obtain information about the specific amount enforceable against him by communicating with the lien claimant or the lien claimant's debtor. *First Federal Savings & Loan Association v. Connelly,* 97 Ill.2d 242, 73 Ill.Dec. 454, 459, 454

N.E.2d 314, 319 (1983). Georgia-Pacific therefore suggests that the allegations of the Amended Complaint are insufficient to suggest that Georgia-Pacific's intent was to induce each owner of property to pay it $392,335.09. The court does not view DuPage's allegations as suggesting any intent on Georgia-Pacific's part to collect more than it was owed. The gravamen of the complaint instead appears to be Georgia-Pacific's overstatement of the amount owed as a means to put undue pressure on DuPage. The court finds DuPage's allegations sufficient in this latter regard.

fers no enforceable rights on DuPage. First Wisconsin is not required under the contract to extend any loans and Georgia-Pacific does not agree to perform any duty directly to DuPage. Moreover, there is no evidence that Georgia-Pacific subordinated its security interest for DuPage's direct benefit. Rather, Georgia-Pacific appears to have been motivated solely by its desire to collect as much of its outstanding loan as possible. While DuPage's remaining in business was essential to this goal, the benefit from a contract standpoint is nonetheless incidental: "Inasmuch as people usually stipulate for themselves, and not for third persons, a strong presumption obtains in any given case that such was their intention, and that the implication to overcome that presumption must be so strong as to amount practically to an express declaration." 17 Am.Jur.2d *Contracts* § 304, at 729–30 (1964), quoted in *Midwest Concrete Products*, 49 Ill.Dec. at 970, 418 N.E.2d at 990.

The fact that DuPage is directly mentioned in the Subordination Agreement is not in the court's opinion sufficient to create a third-party beneficiary relationship. In *Midwest Concrete Products*, a subcontract stated that it was "subject to" the terms of the general contract, which in turn provided a specified amount of liquidated damages to the plaintiff in the event that construction was delayed beyond a certain date. The court nonetheless found that no direct beneficiary relationship was created, since both parties appeared to be acting entirely in their own self-interest. 49 Ill.Dec. at 970, 418 N.E.2d at 990. Analogously, in *Dale v. Groebe & Co.*, 103 Ill.App.3d 649, 59 Ill.Dec. 350, 431 N.E.2d 1107 (1st Dist.1983), a bank's agreement to loan money to plaintiffs in order for them to purchase a home was held to create no enforceable rights in the sellers of the house. DuPage has cited no case in which an agreement among creditors to readjust their rights vis-a-vis a common debtor cre-

ated a right to sue on the debtor's part. That it was in the interest of both creditors for DuPage to stay solvent does not in itself create such a right.

 The court notes that DuPage's Amended Complaint inexplicably omitted the last page of the Subordination Agreement. That page expressly provides that the Subordination Agreement "shall bind and inure to the benefit of the respective successors and assigns of Secured Party [Georgia-Pacific], Borrower [DuPage], and Bank [First Wisconsin]." DuPage apparently was unaware of the existence of this missing page. Consequently, the parties have not briefed the effect of this language on the standing issue. Further briefing on the standing question, however, will not be required, since even if such language sufficiently confers third-party beneficiary status, the court adheres to its conclusion from its 1983 opinion that DuPage has alleged no breach of the Subordination Agreement.

DuPage's claim for breach of the Subordination Agreement is based on its contention that Georgia-Pacific, by subrogating all its "rights, title and interest" in the accounts receivable and inventory of DuPage, relinquished any rights to act with respect to that collateral. The contractual language of the Subordination Agreement belies this contention. Under the agreement, Georgia-Pacific subrogated to First Wisconsin its rights as a U.C.C. secured creditor, and expressly reserved the right to demand payments of DuPage's debts in the ordinary course of business. Georgia-Pacific's sending of lien notices, however irregular, was an attempt to collect an ordinary business debt, and not an exercise of its rights as a secured creditor of DuPage.[7] As noted in this court's earlier opinion, "Georgia-Pacific's status as junior secured creditor would not prevent it from taking action with respect to liens, authorized by the security agreement, so long as Georgia-

---

7. Georgia-Pacific's arguments on this point are not without inconsistency, since Georgia-Pacific relies on § 9–502 of the U.C.C. and its position as a secured creditor to justify its actions. The court does not find this inconsistency to create a triable issue with respect to DuPage's alleged breach of the subordination agreement.

Pacific respected First Wisconsin's prior right to proceeds." That Georgia-Pacific's acts may have violated its prior course of dealing with DuPage does not alter this result, since the Subordination Agreement does not refer to or incorporate any prior agreements between Georgia-Pacific and DuPage.

The only other action complained of by DuPage—Georgia-Pacific's termination of the Subordination Agreement—was clearly within Georgia-Pacific's rights. Damages solely attributable to that termination are therefore not recoverable, regardless of Georgia-Pacific's malice in so doing. *Petit v. Cuneo*, 290 Ill.App. 16, 22, 7 N.E.2d 774, 777 (1937). Accordingly, DuPage's breach of contract claim based on the Subordination Agreement is dismissed for failure to state a claim.

## II. Tortious Interference with Business

### a. Interference with DuPage's Account Debtors

■ According to DuPage, Georgia-Pacific distributed lien notices not to perfect its lien rights but for the ulterior purpose of placing economic duress on DuPage's customers and disrupting DuPage's business relationships with those customers. Earlier in this litigation, the court dismissed DuPage's complaint on this count. Memorandum Opinion & Order, October 25, 1983, at pp. 28–31. In that opinion, the court noted that Illinois law requires plaintiffs in tortious interference cases to allege the absence of justification for the defendant's actions, *Swager v. Couri*, 77 Ill.2d 173, 186–87, 32 Ill.Dec. 540, 547, 395 N.E.2d 921, 928 (1979), and that DuPage had made no effort in either its complaint or its brief to do so. The court reasoned that Georgia-Pacific's meddling in DuPage's affairs was justified by its security interest in the accounts of the customers to whom it sent lien notices, and that DuPage complained as much of Georgia-Pacific's effort to protect that security interest as it complained of the manner in which Georgia-Pacific accomplished that aim. The court emphasized that DuPage had failed

to articulate any response to Georgia-Pacific's arguments, and that any amended complaint would have to tie Georgia-Pacific's actions more directly to an illegitimate rather than a legitimate interest. At issue is whether, by amending its complaint, DuPage has properly met this burden.

Generally, the elements of a claim for tortious interference with contract or with prospective business advantage requires 1) the existence of a valid business relationship or expectancy; 2) knowledge of the relationship on the interferer's part; 3) an intentional and unjustified interference inducing or causing a breach; and 4) resultant damage. *Amalgamated Financial Corp. v. Atlantis, Inc.*, 105 Ill.App.3d 379, 61 Ill.Dec. 264, 434 N.E.2d 417 (1st Dist. 1982); *Belden v. Internorth, Inc.*, 90 Ill. App.3d 547, 551–52, 45 Ill.Dec. 765, 768–69, 413 N.E.2d 98, 101–02 (1st Dist.1980); *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.App.3d 359, 362–63, 300 N.E.2d 331, 333 (3d Dist.1973). Maliciously causing a termination of a contract terminable at will is actionable as tortious interference even though the third party has technically breached no contract. *Getschow v. Commonwealth Edison*, 111 Ill.App.3d 522, 67 Ill.Dec. 343, 348, 444 N.E.2d 579, 584 (1st Dist.1982), *aff'd in part, rev'd in part,* 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984).

Because DuPage has adequately alleged disruption of its customer relationships, the court will concentrate its discussion on the issues of justification and malice. In *Getschow*, the court noted that whether there is just cause for interference depends upon a number of factors, including the interest sought to be protected and the methods used. 67 Ill.Dec. at 349, 444 N.E.2d at 585. This statement of the rule derives from the nature of the interference tort, which implies a balancing of social values. As expressed by the Supreme Court of Illinois,

> The purpose of imposing liability in tort upon persons who interfere with the contractual relations of others is to protect one's interest in his contractual relations against forms of interference which, on

balance, the law finds repugnant. This statement of the tort's purpose itself sows the seeds of the further analysis necessary to determine whether particular conduct ought to give rise to liability. The question presented, ... is whether protection of the particular contractual interest at issue merits prohibition of the particular conduct at issue.

*Swager v. Couri,* 77 Ill.2d 173, 32 Ill.Dec. 540, 547, 395 N.E.2d 921, 928 (1979).

In its earlier opinion, the court held that "defects in a junior mortgagee's efforts [at collection], or even its improper attempt to use a procedure it was not entitled to use," would not be sufficient to allege tortious interference, either as to Georgia-Pacific's alleged interference between First Wisconsin and DuPage or its interference with DuPage's account debtors. It should be noted, however, that DuPage's complaint at that time simply alleged that Georgia-Pacific had made no effort to determine whether the recipients of the lien notices were proper or the dollar amounts correct, and, despite allegations of knowing falsity, only briefly delineated the way in which the lien notices were false. The plaintiff also alleged that Georgia-Pacific's purpose was to get account payments to be made directly to it, rather than to drive DuPage out of business. The present complaint is more detailed as to the false nature of the lien notices and the wrongful intent of Georgia-Pacific.

Georgia-Pacific has cited numerous cases to establish that good faith creditor attempts to collect on loans are absolutely privileged. *Winters v. University District Building & Loan Ass'n,* 268 Ill.App. 147,

156 (3d Dist.1932); *John Deere Co. v. Metzler,* 51 Ill.App.2d 340, 201 N.E.2d 478, 491 (4th Dist.1964). Both of those cases, however, indicate only that malice is irrelevant when a defendant charged with tortious interference clearly acts within its contractual or legal rights. Since material fact disputes exist as to Georgia-Pacific's contractual right to send lien notices, DuPage's complaint cannot be defeated on the grounds of absolute privilege.[8]

Georgia-Pacific secondly argues that good faith creditor attempts are conditionally privileged and therefore not actionable absent a showing of actual malice. *Leo Spear Construction Co. v. Fidelity & Casualty Co. of New York,* 446 F.2d 439, 445–46 (2d Cir.1971); *Challen v. Town & Country Charge,* 545 F.Supp. 1014 (N.D.Ill. 1982); *Midwest Glass Co. v. Stanford Development Co.,* 34 Ill.App.3d 130, 339 N.E.2d 274 (1st Dist.1975); *Diedrich v. Northern Illinois Publishing Co.,* 39 Ill. App.3d 851, 350 N.E.2d 857 (2d Dist.1976). The scope of this conditional privilege, however, appears coterminous with a finding of reasonableness. In *Midwest Glass,* for example, the court noted that a creditor has an absolute right to take *reasonable* actions to pursue a debtor, and held that the sending of non-misleading lien notices "to a limited number of persons who had a natural and proper interest" was not unreasonable as a matter of law. 339 N.E.2d at 277. In *Challen,* the court held that a creditor's letter to an employer informing him of the plaintiff's outstanding debts would not constitute actionable invasion of privacy absent the intentional giving of *unreasonable*

---

**8.** Georgia-Pacific, in its reply memorandum, also argues that its sending of lien notices, because made in connection with a possible judicial proceeding that Georgia-Pacific might have brought, was absolutely privileged. Georgia-Pacific supports this argument by relying upon a footnote in *Paul v. Premier Electrical Co.,* 581 F.Supp. 721 (N.D.Ill.1984), where a plaintiff claimed that he had been libeled by the defendant's filing of a mechanic's lien against property in which plaintiff's partnership held an interest. In that footnote, Judge Bua noted that a lawsuit to foreclose a mechanic's lien cannot be filed without first serving a notice and claim, and

therefore that the notice "might" be absolutely privileged as a statement made in an integral part of a judicial proceeding. 581 F.Supp. at 725 n. 1. Judge Bua expressly declined to make a "judgment" on the issue, however, and it is clear that this point was not carefully considered. The court finds no other support for Georgia-Pacific's broad invocation of judicial privileges, and finds the suggestion in *Paul* implicitly rejected by cases such as *Midwest Glass,* where the court analyzed a tortious interference claim based on the sending of lien notices under principles of conditional privilege only.

publicity for the purpose of harassment or exposure to public ridicule.

The court has already recognized that DuPage has alleged material facts which call into question the reasonableness of Georgia-Pacific's acts and the pureness of its motives. What is less clear is whether DuPage is to be held to a stricter pleading of malice in its interference count than in its breach of contract claim. Illinois courts have required a strict showing of malice:

> [I]ll-will alone is not enough to establish actual malice ... there must be a desire to harm, which is independent of and unrelated to a desire to protect the acting party's rights and which is not reasonably related to the defense of a recognized property or social interest ... A further requirement of a legally sufficient complaint is that it set forth factual allegations from which actual malice may reasonably be said to exist as opposed to the bare assertion of actual malice.

*Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association*, 37 Ill.2d 546, 551, 229 N.E.2d 514 (1967) (in context of petitioning government). *Accord, Schott v. Glover*, 109 Ill. App.3d 230, 64 Ill.Dec. 824, 828, 440 N.E.2d 376, 380 (1st Dist.1982) (in context of attorney's fiduciary duty to client).

In other cases, however, the courts have spoken in terms more favorable to plaintiffs pleading interference torts:

> In its brief, Union Realty misapprehends the meaning of the term "malice" when used in the context of the tort involved herein. It is not necessary to prove that defendant acted with ill will, hostility or an intent to injure. It is only necessary to show that the defendant acted intentionally and without just cause.

*Amalgamated Financial Corp. v. Atlantis, Inc.*, 105 Ill.App.3d 379, 381, 61 Ill.Dec. 264, 266, 434 N.E.2d 417, 419 (1st Dist. 1982) (citations omitted). *Accord, Getschow v. Commonwealth Edison*, 67 Ill. Dec. at 348, 444 N.E.2d at 584.

The parties have given little guidance to the court on the conflicting implications of these cases other than to quote the opposing passages as providing the proper rule of decision. It is apparent, nonetheless, that the question of malice is inextricably bound up with the question of justification. *See Belden v. Internorth, Inc.*, 90 Ill. App.3d 547, 552 n. 1, 45 Ill.Dec. 765, 768 n. 1, 413 N.E.2d 98, 101 n. 1 (1st Dist.1980) (expressly equating the two inquiries). Because Georgia-Pacific had a legitimate interest in the accounts receivable of the DuPage customers it contacted, its actions were conditionally privileged, and DuPage must be held to the stricter standard in this case. Were it shown that Georgia-Pacific employed sharp tactics to collect on its collateral, such evidence would fall short of establishing that Georgia-Pacific deliberately harmed DuPage "independent[ly] of and unrelated to" its legitimate interests. *Arlington Heights*, 37 Ill.2d at 551, 229 N.E.2d 514. Georgia-Pacific's effort to be paid, without more, does not constitute tortious intermeddling in DuPage's affairs.

To sustain its tort allegations, DuPage must establish that Georgia-Pacific used the lien notices not simply in an effort to be paid directly by the account customers, but in order to alienate those customers away from further business with DuPage either as a means of coercing payment or as meaningless or spiteful retaliation. Georgia-Pacific persuasively argues that such intent on its part is unlikely. Nonetheless, it is not this court's province on a Rule 12 motion to determine the most reasonable explanation of events, and the Rule 56 materials submitted by Georgia-Pacific are insufficient to establish beyond doubt that the decision to claim its full debt on each notice was motivated by good faith. For the reasons set forth in the court's discussion of contractual bad faith, DuPage has adequately alleged facts from which malice might be inferred, and must be allowed the chance through discovery to substantiate these allegations. The motion for judgment on DuPage's claim of tortious interference is therefore denied.

*b. Interference as to DuPage and First Wisconsin*

Both DuPage and First Wisconsin have also asserted tortious interference claims

based on Georgia-Pacific's alleged attempt to prevent DuPage from performing its contract with First Wisconsin, and to prevent First Wisconsin from making continued loans to DuPage. In particular, First Wisconsin alleges that the service of the false notices prevented DuPage from making remittances to First Wisconsin in accordance with the terms of the loan agreement between them and reduced the value of the accounts receivable so as to damage First Wisconsin's collateral.

In its October 1983 opinion, the court dismissed First Wisconsin's tortious interference claims solely on the ground of justification, noting that not all defects in Georgia-Pacific's actions would render them tortious, and that First Wisconsin's failure to allege any particulars was fatal to its claim. First Wisconsin properly points out that its Amended Counterclaim alleges with specificity certain bad faith acts on Georgia-Pacific's part, and that the court's prior opinion therefore does not govern this motion. Indeed, as the court has ruled in connection with DuPage's claim for tortious interference, disputed factual issues exist as to Georgia-Pacific's justification in sending out misleading lien notices.

 The court nonetheless concludes that First Wisconsin's counterclaim should be dismissed for failure to allege facts from which actual malice against First Wisconsin can be inferred. As the court held in its earlier opinion, Georgia-Pacific, in its Subrogation Agreement, did not relinquish its rights to go after DuPage's collateral directly, so long as the proceeds would have been applied first to First Wisconsin's claim. Georgia-Pacific therefore had a conditional privilege to send out lien notices. Although the court finds factual disputes both as to the reasonableness of those notices and Georgia-Pacific's motives toward DuPage, nothing in either First Wisconsin's counterclaim or DuPage's complaint suggests that the effects on the relationship between First Wisconsin and DuPage were more than incidental. First Wisconsin cites no case where a party who acts

tortiously towards one party thereby incurs tortious liability to the affected creditors of that party.

Nothing in either First Wisconsin's Amended Counterclaim or DuPage's Amended Complaint suggest any grounds for finding that Georgia-Pacific directly interfered in First Wisconsin's relationship with DuPage. The court does not find that the factual questions regarding Georgia-Pacific's justification in disrupting DuPage's customer relationships should give rise to an independent liability based on the consequences of that disruption for DuPage's relationship with First Wisconsin. Nor does the court find Georgia-Pacific's own relationship with First Wisconsin should create such liability: at most that relationship shows that injuries to First Wisconsin were foreseeable, not maliciously intended. Accordingly, Georgia-Pacific's motion for judgment under Rule 12(c) on First Wisconsin's Amended Counterclaim is granted, and DuPage's interference claims will be construed solely with reference to alleged interference in its customer relationships.

### III. Defamation

The final count of DuPage's Amended Complaint sets forth a claim of defamation. DuPage alleges that Georgia-Pacific knowingly and maliciously distributed false lien notices in order to injure DuPage's reputation. Georgia-Pacific has moved for judgment on several grounds, including the statute of limitations, failure to state a claim, and qualified or absolute privilege. For the reasons set forth herein, the motion for judgment on Count III must be denied.

 The court notes initially that DuPage's defamation count relates back under Fed.R.Civ.P. 15(c) to the filing of DuPage's original complaint and therefore meets the one-year statute of limitations for slander. Ill.Rev.Stat., ch. 83, § 14. Georgia-Pacific cites *Barnes v. Callaghan & Co.*, 559 F.2d 1102 (7th Cir.1977), for the proposition that DuPage's original complaint was insufficient to put Georgia-Pacif-

ic on notice of DuPage's defamation claim and that relation back is therefore improper. The court disagrees.

In *Barnes*, the Seventh Circuit held that a slander count did not relate back to an earlier complaint alleging only sex discrimination and breach of contract. The court relied on the fact that the original complaint did not mention the requisite elements of malice or publication. 559 F.2d at 1106. By contrast, DuPage's original complaint charged Georgia-Pacific with knowingly publishing false representations which harmed DuPage's business reputation, that Georgia-Pacific knew of and foresaw this consequence, and that Georgia-Pacific intended by its conduct to intimidate and otherwise interfere with the operation of DuPage's business. (Original Complaint ¶¶ 13, 17–22, 25).

Georgia-Pacific rightly points out that DuPage's original complaint nowhere specifically alleges an intent to injure DuPage's reputation, only that Georgia-Pacific knew such injury would occur. While the court agrees that the necessary allegation of malice was not expressly stated in DuPage's original complaint, such an allegation was nonetheless implicit in DuPage's claim of interference and falsity, since reputational injury was the means by which Georgia-Pacific intended to intimidate DuPage. This court recently held that the addition of factual allegations in an amended complaint, coupled with a new legal theory, may relate back under Rule 15(c) so long as the new allegations may be fairly characterized as falling within the transaction or course of conduct alleged in the original complaint. *In re Olympia Brewing Company Securities Litigation*, 612 F.Supp. 1370, 1372–73 (1985). DuPage's current allegations of malice substantially overlap with its allegations of wrongful intent in the original complaint. Relation back is therefore proper, and the court proceeds to the merits of DuPage's defamation claim.

Georgia-Pacific initially argues that the lien notices are true and therefore non-defamatory as a matter of law. This argument is predicated on the undisputed facts that DuPage did indeed owe Georgia-Pacific $392,335.09 for building materials, and that DuPage had furnished some of these supplies to the recipients of the notices. As stated earlier, however, the lien notices falsely designate the source of the debt and each notice describes the same debt as arising for materials furnished under a different contract. While the line between the true and the untrue in this case is a fine one, thus supporting Georgia-Pacific's claim of good faith, DuPage has adequately alleged the falsity of the notices, and Georgia-Pacific cannot slight over the clear implications of the language it used in sending out notices of lien.

Second, Georgia-Pacific argues that DuPage's Amended Complaint does not state a claim for libel per se, so that any claim of defamation per quod must be dismissed for failure to allege special damages. The court agrees that DuPage's complaint fails to state a claim for libel per se. A statement is defamatory per se when the words used are "in and of themselves so obviously and naturally harmful that proof of special damages is unnecessary." *Fried v. Jacobson*, 99 Ill.2d 24, 26, 75 Ill.Dec. 398, 400, 457 N.E.2d 392, 394 (1983). While defamation which assails a corporation's financial position is actionable per se, *Garber-Pierre Food Products, Inc. v. Crooks*, 78 Ill.App.3d 356, 33 Ill.Dec. 878, 881, 397 N.E.2d 211, 214 (1st Dist.1979), the notices sent by Georgia-Pacific do not on their face accuse DuPage of mismanagement or inability to pay debts; only by implication do the notices suggest financial instability. Indeed, since DuPage was in fact indebted to Georgia-Pacific for $392,353.09, only in ascribing the debt to specific contracts can the notices be considered false. The alleged libel must therefore be construed not as going to financial instability generally, but to the implication of bad business practices which would attach when DuPage's customers learned that DuPage had incurred massive debts on contracts not requiring large purchases. Where a writing requires innuendo to give

it a libellous meaning, it is not actionable per se, but libel per quod, and requires allegations of special damages. *Bruck v. Cincotta,* 56 Ill.App.3d 260, 13 Ill.Dec. 782, 785–86, 371 N.E.2d 874, 877–78 (1st Dist. 1977); *Newell v. Field Enterprises, Inc.,* 91 Ill.App.3d 735, 47 Ill.Dec. 429, 431, 415 N.E.2d 434, 436 (1st Dist.1980).

The pleading of special damages in diversity actions is governed by Fed.R.Civ.P. 9(g), which requires that items of special damages be "specifically stated." In *Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 270 (7th Cir.1983), the Seventh Circuit held that references to injury through the natural tendency of alleged libel to decrease the plaintiff's sales were insufficient to plead special damages. The Court distinguished its holding in *Continental Nut Co. v. Robert Berner Co.,* 345 F.2d 395 (7th Cir.1965), in which it held that special damages were pleaded with sufficient specificity when the plaintiff listed specific figures of its gross sales both before and after the publication of the statements.

The court in *Continental Nut* had noted that an allegation of special damages "is sufficient when it notifies the defendant of the nature of the claimed damages even though it does not delineate them with as great precision as might be possible or desirable." *Id.* at 397. The plaintiff need not plead the names of customers it claims to have lost. *Id.* The approach of *Continental Nut* was then followed in *Fleck Bros. Co. v. Sullivan,* 385 F.2d 223 (7th Cir.1967). In that case, the plaintiff alleged that, as a result of a defamatory letter, its suppliers were refusing to extend it normal credit terms and that it had expended time, money, and effort to reestablish its credit. *Id.* at 225. The court found these allegations sufficient under Rule 9(g) and noted that the "names, circumstances, and amounts" needn't be pleaded. *Id.*

In its Amended Complaint, DuPage alleges that following the distribution of the purported lien notices to its customers, "DuPage was deluged with calls from these customers informing DuPage that they would not pay their bills and would not make further purchases from DuPage." (Count III, ¶ 23). Exhibit D to the Amended Complaint identifies DuPage's customers, and Exhibit E identifies many of the recipients of the notices. DuPage also alleges that First Wisconsin, as a proximate result of Georgia-Pacific's actions, declared DuPage in default and began demanding payment and surrender of collateral. (¶ 25). While DuPage has not linked its $2,000,000 demand to the above injuries with any particularity, the nature of the damages are specifically set forth. Under *Continental Nut* and *Fleck,* this is sufficient.

It should be noted that the Illinois courts themselves apply a stricter standard of particularity in pleading special damages than that required in the Seventh Circuit. In *Bruck v. Cincotta,* 56 Ill.App.3d 260, 13 Ill.Dec. 782, 371 N.E.2d 874 (1st Dist.1977), the Illinois Appellate Court held insufficient allegations that "certain business associates have stopped doing business with plaintiff for a period of time, and ... purchasers of buildings from the plaintiff have been unwilling to do business with plaintiff...." The court found these allegations to be descriptive of general damages only. 13 Ill.Dec. at 788, 371 N.E.2d at 880. It is unclear whether the complaint in question had listed any names or alleged, as has DuPage, a strong causal connection between the libel and the customer reactions. In any event, the particularity with which a claim must be pled is a matter of procedural rather than substantive law. This court must therefore follow the Seventh Circuit and not the authority of the Illinois courts. Accordingly, DuPage has adequately pled special damages in order to state a claim for libel per quod.

Finally, Georgia-Pacific argues that its sending of lien notices were privileged, and that DuPage has not adequately alleged actual malice. As Georgia-Pacific notes, this argument is parallel to its argument on privilege with respect to DuPage's tortious interference claim. The court finds the privilege issue inappropriate for Rule 12

disposition on the same grounds that it did with respect to Count II, and concludes that DuPage should be allowed further discovery with respect to these allegations.

In sum, then, Georgia-Pacific's motion for judgment against DuPage is granted only to the extent that DuPage seeks damages based on an alleged breach of the subordination agreement or Georgia-Pacific's decision to terminate that agreement. Georgia-Pacific's motion for judgment against First Wisconsin is granted in full.

## MOTIONS FOR RELEASE AND DEPOSIT OF FUNDS

The final matter before the court is First Wisconsin's motion for release of certain funds being held by the court, and Georgia-Pacific's counter-motion to require First Wisconsin to deposit various funds it has collected with the clerk of court. For the reasons set forth herein, both motions are denied.

First Wisconsin's motion for release of funds is predicated on the argument that Georgia-Pacific cannot assert valid mechanics' liens against the funds which would overcome First Wisconsin's position as a senior secured creditor. The funds in question are the result of the settlement of claims held by DuPage on accounts receivable against two of its customers: Current Development Corporation and C.A. Hemphill & Associates. On August 18, 1983, in order to protect these customers from dual payment, First Wisconsin and Georgia-Pacific agreed to have the payments received by the clerk of the district court, and that the parties would then litigate the priority and rights to the funds as if engaged in a mechanic's lien action. The order regarding payment stated that the funds would be held "pending this court's final determination of all claims to said funds."

In its motion, First Wisconsin argues that Georgia-Pacific has not shown, and cannot show, the prerequisites to a valid subcontractor's lien, and that any other interest of Georgia-Pacific in the funds is subordinate to that of First Wisconsin by virtue of the 1979 Subordination Agree-

ment. Although not denominated as a motion for summary judgment, First Wisconsin's motion is clearly based on an argument that the facts are undisputed which would establish its priority as a matter of law. Because the motion relates to previous court orders, and not any of the pleadings, the court understands and accepts First Wisconsin's failure to denominate its motion as one for summary judgment, but will incorporate the general standards from Rule 56 for determining whether the funds should be released.

■ The court agrees that Georgia-Pacific has not shown the prerequisites to a valid subcontractor's lien. On the present motion, however, it is First Wisconsin's burden to show undisputed facts which would establish its entitlement to the funds in question. That burden has not been met on the present record.

First, the deposition materials relied on by First Wisconsin establish that, at the time Georgia-Pacific filed its liens, Georgia-Pacific had no knowledge whether its products had been delivered to the particular properties to which notices were sent. The deposition admissions by Georgia-Pacific employees Richard Snow and Donald Glass further establish that tracing of the materials would be difficult. Nonetheless, the deposition admissions do not affirmatively demonstrate the impossibility of such tracing, and the court cannot rule against Georgia-Pacific on the present record for failing to establish the validity of its liens with respect to the lienability of the materials or satisfaction of the 90–day limitations period required under the Illinois statute.

Second, the court disagrees with First Wisconsin's argument that Georgia-Pacific's decision to list its entire debt without determining the exact indebtedness of each owner amounts to constructive fraud. The case on which First Wisconsin relies, *Fedco Electric Co. v. Stunkel*, 77 Ill.App.3d 48, 32 Ill.Dec. 735, 395 N.E.2d 1116 (4th Dist. 1979), involved a situation where the contractor admitted that he deliberately failed to credit the debtor for payments received,

and that the lien notices also charged the debtor/developer with work actually done for third parties. 395 N.E.2d at 1118. No such admissions have been shown in the present case. While Georgia-Pacific admittedly made no effort to determine the exact indebtedness of each owner (Exhibit E to First Wisconsin's Motion), this in itself does not invalidate its lien. *First Federal Savings & Loan Association v. Connelly*, 97 Ill.2d 242, 73 Ill.Dec. 454, 459, 454 N.E.2d 314, 319 (1983). The inaccuracies in Georgia-Pacific's notices are sufficient to raise a question of good faith, but are not in themselves sufficient to show constructive fraud.

Finally, First Wisconsin argues that Georgia-Pacific cannot assert a subcontractor's lien because of its position as a supplier on open account for various jobs. The deposition excerpts constitute admissions from Donald Glass that, to his knowledge, Georgia-Pacific did not sell lumber to DuPage for any particular building location. As noted earlier in this court's discussion of commercial reasonableness, subcontractors who periodically deliver materials on open account, like Georgia-Pacific, are considered ineligible to assert subcontractor's liens. In *Layrite Products Co. v. Lux*, 91 Idaho 110, 416 P.2d 501, 502 (1966), a lien claimant who generally admitted selling materials on an open running account without reference to particular projects was held to have no valid mechanic's lien. Here, First Wisconsin's evidence comes close to, but falls short of, such a general admission by Georgia-Pacific. In particular, First Wisconsin has not presented any evidence by which this court can determine that Glass's lack of knowledge about particular properties is representative of what others at Georgia-Pacific knew or relied on in selling lumber to DuPage. Such evidence would be crucial to establishing the invalidity of Georgia-Pacific's liens since the use of open account credit does not by itself defeat a mechanic's lien. *Nielsen v. Enchius*, 212 Ill.App. 409, 411 (1st Dist. 1918); *Illinois Institute of Continuing Legal Education, supra*, at 5–10.

The court does agree with First Wisconsin, however, that, to the extent Georgia-Pacific is relying on lien rights which flow from the assignment of DuPage's accounts receivable through the security agreement, common sense and the language of the subordination agreement dictate subordination of those lien rights to First Wisconsin's position. Georgia-Pacific's characterization of the subordination agreement as inchoate, i.e., ineffective until the triggering event of bankruptcy proceedings, is flatly contrary to the language of the agreement. While the subordination agreement describes certain specific rights First Wisconsin may exercise in the event of such proceedings, any fair reading of the agreement indicates that the subordination itself is not so contingent. Rather, the agreement on its face says that Georgia-Pacific "does hereby subordinate any security interest it may now have or may hereafter acquire" in DuPage's accounts receivable, inventory, and proceeds. Since the source of any assignment in this case would be the security agreement, any lien rights obtained thereunder are subject to subordination, and are not within the clause allowing Georgia-Pacific to demand payment of DuPage's ordinary business debts. Further litigation as to the priority of Georgia-Pacific's liens over First Wisconsin's security interest should be limited to Georgia-Pacific's independent lien rights, and not those it purportedly acquired by assignment from DuPage as part of the security agreement.[9]

---

9. The parties disagree on whether the August 1983 order requiring the funds to be held in the court pending a "final determination of all claims to said funds" refers to the claims of mechanic's lien priority or all Georgia-Pacific's claims as set forth in its complaint against First Wisconsin. I did not draft the actual order, and do not have an independent recollection of what was discussed or intended. First Wisconsin should request the minute clerk to schedule a conference with all parties to clarify the scope of the August 1983 order if it wishes to renew its motion for release of funds, since a broad reading of that order would limit the utility of a renewed motion.

With respect to Georgia-Pacific's motion for depositing of funds with the court, Georgia-Pacific has failed to show persuasive grounds for overriding the bankruptcy court's previous determination that the parties are properly protected by the order allowing First Wisconsin to make conditional application of funds. If Georgia-Pacific succeeds on its claims against First Wisconsin, it will be entitled to payment then, and there is no suggestion that present protection of that right is required.

### CONCLUSION

In 82 C 4531, Georgia-Pacific's motion for judgment on the pleadings is granted as to DuPage's claims based on breach of the subordination agreement or Georgia-Pacific's termination of that agreement, but is otherwise denied. In 82 C 6768, Georgia-Pacific's motion for judgment on the pleadings on First Wisconsin's Amended Counterclaim is granted. All motions regarding release or deposit of funds in 82 C 6768 are denied.

It is so ordered.