WILLIAM C. KORBAR, Plaintiff-Appellant, *v.* THOMAS HITE *et al.*, Defendants-Appellees.

First District (4th Division)   No. 62339

Opinion filed October 27, 1976.

Stanley H. Jakala, of Berwyn, for appellant.

Gilbert Feldman, of Kleiman, Cornfield and Feldman, of Chicago, for appellees.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Plaintiff, William C. Korbar, brought this action to recover damages from Thomas Hite, "Aluminum Workers News," and Local Union 3911 of the United Steelworkers of America, AFL-CIO, for alleged defamatory statements contained in an article in the "Aluminum Workers News." The trial judge granted defendants' motion to dismiss, and plaintiff has appealed.

The amended complaint in this cause of action alleged that plaintiff had been elected president of the Reynolds-McCook Employees Credit

Union in Brookfield, Illinois. On September 13, 1974, defendant Thomas Hite, president of Local 3911 of the United Steelworkers of America, wrote two letters to plaintiff; the first requested a meeting to discuss matters of alleged differences between certain members of Local 3911 who belonged to the credit union, and the second requested that plaintiff cease and desist from the practice of denying members of the credit union the right to withdraw their proxies. Plaintiff responded by letter dated October 2, 1974, that no member had ever been refused his permanent proxy upon request; that he did not need help from any member of the local unions; and that he felt it was his prerogative to disregard the invitation to meet with Hite.

In January 1975, an article titled "Is Your Credit Union Above Board?" by Thomas Hite, appeared in the "Aluminum Workers News." The article, in its entirety, read as follows:

"The question, is your credit union serving you or is it headed by a president that is insensitive to your needs or desires? I think that these are some of the questions that you should be interested in getting an answer to before you think about putting the same Board of Directors back in at the next Annual Meeting. From what has been told to me, your credit union seems to be run by a president and a majority of the Board of Directors that think that they own it and anytime you seek service from them, they will be doing you a favor.

After receiving a mandate from you to discuss some of your grievances with Mr. Kobar [sic] in an effort to resolve them, I got in touch with Mr. Kobar and requested a meeting with him. In essence Mr. Kobar said that he could care less about the steelworkers problems and that he would do as he pleases. Perhaps, if Mr. Kobar had tried, I am sure that many of the grievances or misunderstandings could have been resolved or explained and all would have been satisifed. I am well aware that the Board of Directors makes policy governing the operation of the credit union, but common decency dictates that every man or woman be afforded proper dignity and respect due any human being.

I do think that the Spanish Speaking members should be treated with dignity. I do think the manager should not stand in the back of the office and transact business with a member where everyone can hear.

I do think that if you cannot help a member, that he or she should be called into an office and told why and that member should be counciled [sic] as to what would be the best alternative to the problem.

I do think that the credit union should give back your proxy if you want it and allow you the chance to exercise your democratic right to vote for the people of your choice.

I do hope that as a part of plant management, that Mr. Kobar does not reflect the sentiment of the company. I have never wanted to become anything in the credit union but a member and I have never experienced any of the indignities that I've been told other members experienced, but when one member of the steelworkers is treated unfairly, then it may as well be me.

I say to all members of the local union and the credit union, demand your right to vote and use it as you see fit to."

The amended complaint alleged that this article misrepresented the contents of plaintiff's October 2 letter by language that imputed inability to perform or want of integrity in the discharge of duties of the president of the credit union. It further alleged that subsequent to the publication of the article, the Attorney General's Office of the State of Illinois and the Department of Financial Institutions determined that the material contained in the article was without substance and totally false in that plaintiff had conducted himself properly in the matter of the proxies and in the business affairs of the credit union. As a result of this publication, plaintiff contends that he was subjected to ridicule and harassment with the ultimate loss of his position as president of the credit union; that the credit union lost approximately $350,000 in withdrawals; and that he did not receive his usual merit salary increase as an employee of the Reynolds Metal Company. Malice was alleged to be the gist of the action.

Four issues are raised on appeal: (1) whether the language of the union newspaper article is libel per se; (2) whether plaintiff is a public official and therefore precluded from recovering without proof that defendant acted with actual malice or reckless disregard of the truth; (3) whether the article is libel per quod; and (4) whether the libel contains sufficient language to establish malice as the gist of the action.

■■ Words may be actionable per se, as plaintiff contends, if they directly tend to prejudice or injure any person in his profession, trade or business and are used in relation to his occupation. (*Valentine v. North American Co. for Life & Health Insurance* (1973), 16 Ill. App. 3d 277, 280, 305 N.E.2d 746, *aff'd*, 60 Ill. 2d 168, 328 N.E.2d 265.) However, the threshold question in this case is whether the article was defamatory. There is no general rule defining what words are defamatory and, therefore, each case depends upon its own facts. (*Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101, 106, 205 N.E.2d 44.) Whether a writing is libelous is a question of law to be determined by the court, and in making that determination, courts apply the "innocent construction" rule. (*Von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d

1025, 1031, 305 N.E.2d 252.) The innocent construction rule, as enunciated by our supreme court in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, 181 N.E.2d 105, " * * * holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that the words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law."

■■ The first and second paragraphs of defendant's column complain of plaintiff's alleged insensitivity to steelworkers' problems, needs and desires. This language can be innocently construed to mean that communication between the union members and plaintiff was unsatisfactory and that plaintiff was unaware of certain grievances which were common among the membership. The statements, in context, do not impugn plaintiff's ability to perform or his integrity in the discharge of his duties so that the article would be libelous per se under the common law. Words may be characterized as extreme or bitter, and may hold up plaintiff to execration, but still may be found not libelous per se under Illinois law. (*Von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d 1025, 1031, 305 N.E.2d 252.) We hold that under the innocent construction rule, the words contained in the first part of the article were not libelous as a matter of law. (Accord, *Valentine v. North American Co. for Life & Health Insurance* (1974), 60 Ill. 2d 168, 328 N.E.2d 265; *Kaplan v. Greater Niles Township Publishing Corp.* (1971), 2 Ill. App. 3d 1090, 278 N.E.2d 437; *Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101, 205 N.E.2d 44.) The language contained in the headline and the latter part of the article referring to the withholding of proxies is also nonlibelous under the innocent construction rule because these words may be construed as criticism of credit union policy rather than impugnment of plaintiff's business or professional reputation.

Furthermore, we believe that even if the language was actionable per se as an impeachment of plaintiff's business or professional reputation, plaintiff still could not recover under these circumstances. The United States Supreme Court in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, held that damages could not be awarded to a public official in a suit for libel based upon defamatory criticism of his official conduct without proof that the defendant acted with actual malice or with reckless disregard of the truth. This rule represented an accommodation between the competing concerns of freedom of speech and the individual's right to be protected from and to redress defamatory attacks upon his reputation.

In *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, this conditional privilege to comment on public officials was extended to include "public figures" who are involved in issues which the public has a justified and important interest. A public figure may

recover damages for defamation which substantially endangers his reputation only on a showing of highly unreasonable conduct constituting an extreme departure from ordinary journalistic standards.

However, in *Rosenbloom v. Metromedia* (1971), 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811, the Supreme Court stated that the first amendment's impact upon State libel laws derived not so much from whether the plaintiff was a "public official," "public figure," or "private individual," as it derived from the question of whether the allegedly defamatory publication concerns a matter of public or general interest. It was held that a libel action by a private individual for a defamatory falsehood relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamation was published with knowledge that it was false or with reckless disregard of whether it was false or not. The court stated at page 43 of its opinion:

> "The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety."

The issue was further clarified in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, where the court classified public figures into two groups: those who occupy positions of such persuasive power and influence that they are deemed public figures for all purposes, and those who have thrust themselves to the forefront of certain controversies in order to influence the resolution of the issues involved, thereby inviting attention and comment. The court determined that "[i]t is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. 323, 41 L. Ed. 2d 789, 812.

Our supreme court decided in *Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286, 253 N.E.2d 408, that the scope of the public figure classification is not limited to utterances that might embrace the resolution of political or governmental questions, but rather encompasses discussion on matters of public interest. Accordingly, an osteopathic physician who was labeled a "quack" in a newspaper article was found to be a public figure because the publication concerned a matter of vital importance; that is, the qualifications and practices of a person representing herself as qualified to treat human ills. The operator of a nursing home was found to be a public official in *Doctors Convalescent Center, Inc. v. East Shore Newspapers, Inc.* (1968), 104 Ill. App. 2d 271, 244 N.E.2d 373, by reason of the public interest in the institutionalization of the ill, infirm, and minor wards of the State. In *Basarich v. Rodeghero* (1974), 24 Ill. App. 3d 889, 321 N.E.2d

739, teachers and athletic coaches in a community high school were found to be "public officials" or "public figures" because of, *inter alia*, their highly responsible positions in the community and public concern with their conduct and policies.

■■ We believe that the *New York Times* privilege for defamation of public officials and *its extension to public figures is applicable to the case* at bar. Looking to the nature and extent of plaintiff's participation in the controversy giving rise to the alleged defamation, it is apparent that plaintiff thrust himself into the forefront of the action by virtue of being elected president of the credit union. In so doing, he invited attention and comment on his official conduct and policies. While he cannot be deemed a public figure for all purposes, it is clear that in this context plaintiff may not use the protection afforded a private individual to insulate himself from such comment. This, together with the fact that the article was published in a union newspaper by a member of the credit union concerning a matter of general interest to the membership, is sufficient to bring the cause under the conditional privilege.

The primacy of our holding that no libel has been shown is dispositive of the remaining issues concerning whether libel per quod existed, or whether the language was sufficient to establish malice as the gist of the action.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DIERINGER and BURMAN, JJ., concur.