THEODORE J. BRUCK *et al.*, Plaintiffs-Appellants, *v.* GALE CINCOTTA *et al.*, Defendants-Appellees.

First District (5th Division)    No. 77-635

Opinion filed December 9, 1977.—Supplemental opinion filed on denial of rehearing January 27, 1978.

Eugene Lieberman, of Chicago, for appellants.

William P. Wilen, Miriam N. Geraghty, Arnold S. Rosenberg, and Jeffrey M. Shaman, of Chicago, for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from an order sustaining a motion to dismiss an amended complaint in a libel action.

The amended complaint preliminarily alleges that plaintiffs were engaged in the purchase of real estate for resale at a profit; that during the years 1974 to 1976 they purchased homes, at open auction or by sealed bid, from the Department of Housing and Urban Development (HUD); that these homes had been foreclosed or abandoned and required repair and rehabilitation; that after they had rehabilitated the homes, they were offered to the public for sale; and that they made a profit of less than 10% on a total investment of $850,000 in these homes.

It is also alleged that defendants "maliciously and with a reckless disregard for truth" published and caused to be distributed a press release "containing false and defamatory statements" which implied that plaintiffs were thieves, since they were referred to in the press release as "rip-off speculators"; that the term "rip-off" was known and accepted in the community as "an act of stealing," which is also the dictionary definition of the term; that the press release was intended to charge that the homes being sold by plaintiffs were not rehabilitated; that people who bought them "would be saddled with building code violations, and major repairs; and that if plaintiffs did even minor repairs, they had done so illegally and without city permits."

Defendants filed a motion to strike and dismiss, stating (1) that the statements complained of were protected speech under the United States and Illinois constitutions; (2) that there were no allegations as to what statements in the press releases were false; (3) that not only was there a failure to allege malice with particularity, but also the amended complaint did not contain language sufficient to establish malice; (4) that the statements were not defamatory as a matter of law nor libellous per se, and special damages were not pleaded to establish libel per quod.

The amended complaint sets forth the press release as follows:

"HUD 'loses' $1 million to Speculator—Homeowners Get RIPPED OFF!

This report is based on a sample of 40 properties out of 66 in the City of Chicago that Theodore J. Bruck, et al., purchased for the Conteco Co. at HUD sealed-bid sales of its houusing [sic] inventory. The sales took place between August 1974 and May 1976. Bruck and friends also bought 35 properties in the suburbs at these sales.

HUD conducted these sales as a means of reducing its inventory of abandoned houses, and 'to provide needed low-cost housing to the people' [sic]. In newspaper ads for the sales, which preceeded [sic] each sale, HUD indicated that the houses contained city code

violations. HUD set a base price for the houses, and bidders could offer as much or as little above this price as they liked. The base price was an indicator of the condition of the house; Conteco often paid twice the base price for properties. Conteco didn't mind paying more because it was assured of making high profits on the resale of the houses. In fact Conteco did reap a half million dollars in profits.

What Happened to the Rehab?

Out of 40 houses that we title-searched there are only 11 electrical permits on file with the city of Chicago Department of Buildings. Not one construction-plumbing permit was issued to anyone for these houses! One electrical permit was issued after the house was resold, indicating that Conteco did not pay for the work.

Two houses stand out as 'super rip-offs'. Bruck bought one, at 6352 S. Laflin in West Englewood, for $100.01. This house had minimal electrical work on it before it was resold (a maximum of $100.00 worth.) This house was abandoned for 2½ years before Bruck sold it for $19,000 (see interview).

The other bargain bonanza is at 5310 S. Bishop in New City. This house was abandoned for at least one year before Bruck bought it for $500.01 and resold it for $19,000. This house had no electrical or construction permit.

The properties are located throughout the south and west side neighborhoods of the city. Communities with the highest numbers of Conteco rehab-specials are West Englewood, Auburn Gresham and Roseland.

The Bruck-Conteco purchases averaged $9,000. Their average profit was $14,000. If these houses were in such good condition (needing no rehab) when HUD held them, they should not have been sold to a speculator, but directly to an individual. They could have been sold for less and HUD could have recovered more dollars. If the houses did need work, the people who bought them from Bruck were saddled with code violations and major repairs. If Bruck-Conteco did even minor repairs, he did so illegally i.e. without a city permit.

Who Fronts the Money?

Another major question is, who's supplying Bruck with the capital or credit to purchase the properties from HUD. Conteco's stated capital, from 1975 Annual Report, is only $10,000. In researching the sample houses, we found that neither Bruck's nor any of his associates' names appear in the title records. The records shows [sic] that the HUD owned properties transferred to a bank

trust account. Twenty-seven of the title searched properties were in a trust account at the American National Bank and Trust Company (a member of the Mayor's Rehab Commission). Another trust account with 8 properties is with Ford City Bank. We have been advised by various banks that this type of 'land trust' is frequently used as collateral for loans from the same institution. In addition, they are used to hide the owner of the property from the public.

HUD recently discontinued the sealed-bid sales in favor of holding auction sales. The main difference is that $2,000 must be posted in escrow to guarantee that the property will be rehabilitated in six months. At the four auctions in May and June Bruck bought 86 more properties. We have estimated Bruck paid over $600,000 for these properties and had to put up another $172,000 in escrow. For the escrow a speculator can either put up cash or a letter of credit. At this time, HUD has refused to tell us what Bruck used. We have put in a Freedom of Information request to force HUD to reveal this. Our preliminary findings have shown that at least 2/3 Bruck's purchases in the auctions have again been put in trust with American National. American National which has done nothing to make the Mayor's Rehab Commission work (along with the other big banks) is providing a shelter and probably financing for this rip-off speculator. Meanwhile HUD would rather allow this speculator to make outrageous profits at the expense of our neighborhoods than rehab and/or sell the properties themselves."

Attached to the press release and included in the amended complaint was a chart which provided information as follows concerning each of 40 homes purchased by plaintiffs from HUD during 1974 through 1976: The address, the number of years abandoned, the date of purchase and amount paid to HUD, the date of resale and the amount received, the amount of electrical work performed, and plaintiff's gross profit. The chart shows that plaintiff paid $384,536.34 for the 40 homes, that it did only $1,915 of electrical work on them and eventually sold 36 of the homes for the total amount of $854,500—realizing a gross profit on those 36 of $495,017.73.

The order dismissing the action with prejudice stated: "The court further finds as a matter of law that any and all statements contained in the press release * * * are not defamatory."

OPINION

■■ Defamatory writing is either libellous per se or per quod. (*Cook v. East Shore Newspapers, Inc.* (1945), 327 Ill. App. 559, 64 N.E.2d 751.) A

publication is libellous per se if it is false and so obviously and materially hurtful to the person aggrieved that proof of injurious character can be, and is, dispensed with. (*Bontkowski v. Chicago Sun-Times & Field Enterprises, Inc.* (1969), 115 Ill. App. 2d 229, 252 N.E.2d 689.) Words libellous per quod are also false, but require an innuendo to give them a libellous meaning and require evidence to show that as a matter of fact some substantial injury has followed from their use. See *Kirk v. Village of Hillcrest* (1975), 31 Ill. App. 3d 1063, 335 N.E.2d 535; 33A Ill. L. & Prac. *Slander and Libel* §11 (1970).

■■ A writing, to be libellous per se, must contain a false statement which imputes to the plaintiff any of the following offensive categories: (1) the commission of a crime; (2) the infection with a loathesome disease; (3) the unfitness or want of integrity in performing the duties of an office or employment; or (4) words which adversely reflect on a particular party's abilities in his business, trade or profession. *Bontkowski v. Chicago Sun-Times; Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482.

■■ Plaintiffs contend that three references in the press release fall within category (1). First, they argue that a crime was imputed by the following language: "If the houses did need work, the people who bought them from Bruck were saddled with code violations and major repairs. If Bruck-Conteco did even minor repairs, he did so illegally i.e. without a city permit." In order for words charging the commission of a crime to be libellous per se, the offense must be indictable, involve moral turpitude and be punishable by death or imprisonment rather than by a fine. *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 221 N.E.2d 516.

■■ There is no provision in the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 1—1 *et seq.*) providing for criminal sanctions against a property owner who fails to obtain a permit for repairs or alterations of a building. We note, however, that the Chicago Municipal Code (Chicago, Ill., Municipal Code, ch. 39, §4 (1973)) provides that a person who fails to obtain a permit when one is required is subject to a fine. Thus, because such a failure is punishable only by fine and is not an indictable offense involving moral turpitude, we conclude that this first reference did not impute to plaintiffs the commission of a crime. *Mitchell; Reed v. Albanese* (1966), 78 Ill. App. 2d 53, 223 N.E.2d 419.

Furthermore, it has been held that where language which otherwise might be considered actionable is conditioned or qualified by use of the word "if," it is not actionable per se. See *McKee v. Ingalls* (1842), 5 Ill. 30.

Secondly, plaintiffs assert that the commission of a crime is imputed because they are termed "rip-off speculators." They point out that

"rip-off" has the dictionary definition of "an act of stealing; theft," and they conclude that it carries an imputation that they committed the crime of theft. Defendants, however, call attention to the fact that "rip-off" is also defined as "financial exploitation" and as "exploitation, especially of unfortunates," with the word "exploit" defined as "to turn to economic account." They contend that under the innocent construction rule, the phrase "rip-off speculators" should be considered as a charge that plaintiffs turned HUD or the home buyers to its economic account.

Illinois follows what was termed in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148, as "the innocent construction rule," and the court stated:

> "That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (24 Ill. 2d 437, 442, 181 N.E.2d 105, 108.)

Whether language is susceptible of an innocent construction in a libel action is a question of law for the court, to be resolved by reading the language stripped of innuendo. *John v. Tribune; Moricoli v. Schwartz* (1977), 46 Ill. App. 3d 481, 361 N.E.2d 74.

■■ Here, "rip-off" not only appears in the term "rip-off speculators," but it is also used on two other occasions in the press release—first, in the heading, where it was stated: "HUD 'loses' $1 million to Speculators—Homeowners Get Ripped Off!" It is clear, however, that HUD was the subject of this heading, as nothing is contained in the text of the paragraph thereunder concerning defendants other than the statements that they were "assured of making high profits on the resale of the houses" and that "in fact Conteco did reap a half-million dollars in profits." These statements do not remotely suggest theft. "Rip-off" also appears in a subsequent comment, that "[t]wo houses stand out as 'super rip-offs'." This reference concerned two buildings purchased from HUD for $100 and $500, each of which was later sold to third persons for $19,000. Again, we believe that the use of the word "rip-off" is not indicative of theft.

Thus, while the word "rip-off" is derogatory, upon consideration of the press release as a whole as we are required to do, we believe it is capable of being read innocently as an exploitation or a turning of HUD or the homeowners to plaintiffs' account. This is particularly so in view of the fact that it is used in the phrase "rip-off speculators," not as a verb or noun but as an adjective to qualify "speculators," which is dictionary defined as "to enter a business transaction or other venture from which the profits, return of investment, capital, or other good are conjectural."[1]

---

[1] The Merriam-Webster Third New International Dictionary (Unabridged ed. 1966).

There is no general rule defining what words are defamatory, and each case must depend upon its own facts (see *Korbar v. Hite* (1976), 43 Ill. App. 3d 636, 357 N.E.2d 135) and, while we are mindful of the fact that the use of the word "rip-off" might, under other circumstances, impute the commission of a crime, in the instant case the contrary appears clear to us.

Plaintiff also suggests that the press release falls within categories (3) and (4). They do not, however, point to any specific statements which support this suggestion and, in the absence thereof, we are unable to make a determination in this regard. Plaintiffs attempt support by a comment general in nature, as follows:

> "[T]o call plaintiff 'rip-off speculators', intimating that they were selling houses with little or no rehabilitation or repair, and that people who bought their houses were saddled with code violations and major repairs, and that what little repairs might have been done were done illegally, falls most certainly within categories 1, 3 and 4."

We have heretofore stated our belief that the term "rip-off speculators," as used in the release, was not libellous per se. The remainder of the quoted phrase is apparently taken from the following statement:

> "If the houses did need work, the people that bought them from Bruck were saddled with code violations and major repairs. If Bruck-Conteco did even minor repairs, he did so illegally i.e. without a city permit."

We have also stated above that this particular quote did not impute the commission of a crime.

Consistent with the foregoing reasoning, we conclude that the amended complaint does not allege an action libellous per se.

We turn then to the question of whether libellous per quod has been alleged. Language not falling within any of the four categories of libel per se may still be actionable where it is false and special harm results. (See *Kirk v. Village of Hillcrest* (1975), 31 Ill. App. 3d 1063, 335 N.E.2d 535; Restatement of Torts §558 (1938).) In this regard, it has been clearly established in Illinois that to start an action libellous per quod, special damages must be alleged with particularity, and general allegations as to damages are insufficient. (*von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d 1025, 305 N.E.2d 252; *Hambric v. Field Enterprises, Inc.* (1964), 46 Ill. App. 2d 355, 196 N.E.2d 489; *Life Printing & Publishing Co. v. Field* (1944), 324 Ill. App. 254, 58 N.E.2d 307.) Thus, complaints were held to be insufficient where the allegations were descriptive of general damages only in the following cases: In *von Solbrig Memorial Hospital v. Licata*, where the hospital alleged it "had been injured in its reputation in the community and had suffered substantial economic loss"; plaintiff Dr.

von Solbrig alleged that he "suffered ill health, emotional distress and damage to his reputation and medical practice"; plaintiff Uptain alleged "the statements impugned Uptain's reputation as director of nurses and caused her ill health and economic loss." (15 Ill. App. 3d 1025, 1028, 305 N.E.2d 252, 254.) In *Grabavoy v. Wilson* (1967), 87 Ill. App. 2d 193, 196, 230 N.E.2d 581, 583, where the court referred to the damage allegations as follows:

> "It was then alleged generally that plaintiff was damaged in his reputation in the community and as a public official and that he suffered loss of business profits and that such business was in lesser amount and its profits lower following the issuance of said information."

In *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482, where the allegations of damage were to plaintiff's good name, reputation and business, and that clientele had been driven away by defendant's article.

In the instant case, the allegations of damage in plaintiff's amended complaint are as follows:

> "[P]laintiffs have been greatly injured in their credit and reputation, and certain business associates have stopped doing business with plaintiff for a period of time, and prospect of purchasers of buildings from the plaintiff have been unwilling to do business with plaintiff and will be so induced in the future."

These allegations are descriptive only of general damages (*von Solbrig Memorial Hospital v. Licata; Grabavoy v. Wilson; Hambric v. Field Enterprises, Inc.*) and, in view of our prior conclusion that an action libelous per se was not alleged in the amended complaint, we hold that the trial court properly sustained the motion to dismiss this cause on its pleadings.

For the reasons stated, the judgment is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.


### SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

In their petition for rehearing, plaintiffs have raised several questions, only one of which we believe requires consideration; namely, that a recent decision (*Halpern v. News-Sun Broadcasting Co.* (1977), 53 Ill. App. 3d 644, 368 N.E.2d 1062), which appeared in the advance sheets

subsequent to the filing of our opinion, is contrary to our holding that a libel per quod cause of action was not stated because special damages were not alleged with particularity.

In *Halpern,* the order dismissing the complaint stated that it "fails to state a cause of action in that it fails to allege actual malice or special damage." We note, however, that the issue on appeal was whether a libel per se had been alleged, and the court, in reversing, found that the complaint sufficiently alleged libel per se and, thus, that plaintiff "was not required to allege special damages." Then, the court stated:

> "Even if we are wrong in our conclusion that there is no requirement that the corporate plaintiff in the instant circumstances allege special damages, we do not believe that the complaint herein can be properly dismissed for failure to include such allegations. We note that in part the corporation has pled that it has lost income and continues to lose income as a result of patients leaving the home and other patients removing their applications. We believe that this constitutes a proper allegation of special damages. *Cf., Windsor Lake, Inc. v. WROK* (1968), 94 Ill. App. 2d 403, 236 N.E.2d 913." 53 Ill. App. 3d 644, 653, 368 N.E.2d 1062, 1069.

*Halpern* does not alter our opinion that the complaint in the instant case alleges only general damages. First, because the quoted statement above is merely dictum, the court having found that an action libelous per se had been stated and therefore that special damages need not be alleged. Second, although the specific allegations of the complaint as to damages are not set forth in *Halpern,* it appears that they may properly have alleged special damages. This is indicated from the fact that, in *Windsor Lake,* the supporting case cited in the above quote from *Halpern,* special damages were alleged. Third, because allegations of damages similar to those in the instant case were found to allege only general damages in *Grabavoy v. Wilson* (1967), 87 Ill. App. 2d 193, 196, 230 N.E.2d 581, 583; *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482; *The von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d 1025, 305 N.E.2d 252; and *Hambric v. Field Enterprises, Inc.* (1964), 46 Ill. App. 2d 355, 196 N.E.2d 489.

In view of the foregoing, we adhere to the findings of our opinion and, accordingly, the petition for rehearing is denied.

Petition for rehearing denied.

LORENZ and WILSON, JJ., concur.