MARGARET VAN DUYN, Plaintiff-Appellant, v. GERALD T. SMITH, Defendant-Appellee.

Third District No. 3—87—0598

Opinion filed August 9, 1988.—Rehearing denied September 20, 1988.

524

John M. Wood, of Goldsworthy, Fifield & Hasselberg, of Peoria (Michael R. Hasselberg, of counsel), for appellant.

Daniel J. Smith, of Morton (Harry M. Williams, of counsel), for appellee.

JUSTICE SCOTT delivered the opinion of the court:

This case comes on appeal pursuant to the trial court's dismissal, with prejudice, of plaintiff's multicount complaint for failure to state a cause of action. Although numerous motions and pleadings were filed in this cause, the relevant pleadings subject to review are plaintiff's second amended complaint counts I and II, amended count IV, and plaintiff's original complaint count III.

Plaintiff's second amended count I alleges the tort of intentional infliction of severe emotional distress; second amended count II alleges libel/negligence; amended count IV alleges libel/malice; and original count III alleges invasion of privacy (false light).

The relevant facts, as alleged, indicate that plaintiff, a private person, is, and was at all times stated herein, employed as the executive director of National Health Care Services of Peoria, Inc., an ambulatory surgical treatment center licensed by the State of Illinois, offering first trimester abortions to women in central Illinois. Defendant, a pro-life activist, is employed by Bradley University.

Plaintiff alleges that during a two-year period from March 21, 1984, to March 21, 1986, defendant performed the following acts: in his motor vehicle, followed plaintiff in her motor vehicle on several occasions; confronted plaintiff at the Peoria Airport and interfered with her ingress and egress to said airport on at least two occasions; picketed plaintiff's residence on November 17, 1984, in violation of section 21.1—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 21.1—1); picketed plaintiff's employer several times a month; confronted plaintiff at her residence and her place of employment on several occasions requesting plaintiff to quit her position as executive director of the National Health Care Services of Peoria, Inc., and on March 15, 1986, caused to be distributed a "Wanted" poster as well as and in conjunction with a "Face The American Holocaust" poster to plaintiff's friends, neighbors and acquaintances living in the three-block area surrounding plaintiff's residence.

Plaintiff claims that the "Wanted" poster, attached to the complaint, resembling those used by the Federal Bureau of Investigation

and seen on bulletin boards in public places, states that plaintiff is a wanted person "for prenatal killing in violation of the Hippocratic Oath and Geneva Code"; that plaintiff uses the alias "Margaret the Malignant"; that plaintiff has participated in killing for profit and has presided over more than 50,000 killings; and the plaintiff's *modus operandi* is a small round tube attached to a powerful suction machine that tears the developing child limb from limb. The poster further contains a statement at the bottom which indicates in part, that "[n]othing in this poster should be interpreted as a suggestion of any activity that is presently considered unethical. Once abortion was a crime but it is not now considered a crime."

The "Face The American Holocaust" poster, also attached to the complaint, contains pictures of fetuses between 22 and 29 weeks gestational age that have been aborted. Under each picture the "cause of death" of the fetus is listed, referring to the method used to perform the abortion. Among the techniques listed are dismemberment, salt poisoning, and massive hemorrhaging. The poster also contains four paragraphs of information regarding the discovery of some 17,000 fetuses stored in a 3½-ton container in California, the number of abortions performed per day in "America's abortion mills," and how "America's Holocaust is the responsibility of us all." The poster additionally gives the name and address of Pro-Life Action League and lists the defendant's name and telephone number for those who choose to call locally.

Although count III varied slightly, plaintiff further alleged the following: that as a result of defendant's actions, her good name, character and reputation were impaired and brought into disrepute before her friends and acquaintances; that she became emotionally upset and suffered great anxiety and mental anguish; that she was humiliated and embarrassed in front of her friends and neighbors; that she became physically upset, nervous and cried; that her blood pressure became elevated beyond normal limits for several days; that her vision was impaired for approximately 24 hours; that she sought and received emergency medical care at Proctor Hospital and was treated by a physician at Proctor Hospital for several hours because of her physical and emotional condition of ill-being and remained under medication and a doctor's care for approximately two months; that she became physically and emotionally exhausted and had to lie down for approximately 24 hours; that she was unable to work at her occupation and had to cease work for several days; that she could not sleep for several days; and that she incurred doctor and hospital bills. Plaintiff also alleged that her damages exceed $15,000.

■ The procedural posture of the case is that it comes to this court pursuant to the trial court's granting of defendant's motions to dismiss. Two of defendant's motions to dismiss are at issue since the dismissal of original count III was by order dated July 15, 1986, and the order dismissing second amended counts I and II and amended count IV was entered August 26, 1987. In both motions, however, the defendant has failed to state the section under which the motion was brought. Therefore, our first determination is whether defendant's respective motions were brought pursuant to section 2—615 or section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, pars. 2—615, 2—619), as those sections involve dismissal by different legal theories. (*MBL (USA) Corp. v. Diekman* (1985), 137 Ill. App. 3d 238, 484 N.E.2d 371.) Both of defendant's motions to dismiss allege that plaintiff's complaint fails to "allege sufficient facts to state a cause of action." Therefore, we construe defendant's statement as disputing the sufficiency of plaintiff's complaint and consider the motions as being brought under section 2—615. As support for our position, we note that motions to dismiss under section 2—619 admit the legal sufficiency of the attacked pleadings and allows assertions of affirmative matter, with or without supporting affidavits, to defeat the plaintiff's claim. (Ill. Rev. Stat. 1985, ch. 110, par. 2—619.) Here, defendant has not admitted the legal sufficiency of the complaint.

■ Our inquiry then, is to determine whether plaintiff has pleaded sufficient facts to state a cause of action for any or all of the asserted theories of recovery. We keep in mind that "[a] cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle plaintiff to recover." (*Ogle v. Fuiten* (1984), 102 Ill. 2d 356, 360-61, 466 N.E.2d 224, 226; *Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 187, 308 N.E.2d 790, 794.) We will discuss the required elements for each tort thoroughly as we separately discuss each alleged cause of action.

Plaintiff's second amended count I alleged that defendant committed the tort of intentional infliction of severe emotional distress. In *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765, our supreme court set forth the conduct giving rise to a cause of action:

"First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities. 'It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict

emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency ***.' Restatement (Second) of Torts, sec. 46, comment *d* (1965).

Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable. 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.' Comment *j*. See also Prosser, Law of Torts sec. 12, at 54 (4th ed. 1971).

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. (Comment *i*.) Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. Prosser, Law of Torts 60 (4th ed. 1971).

Fourth, as is stated in comment *e*, the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." (Emphasis deleted.) *Public Finance Corp. v. Davis*, 66 Ill. 2d at 89-90, 360 N.E.2d at 767.

In *Davis*, the defendant, a creditor of the plaintiff, persistently attempted to collect on a debt plaintiff owed. The defendant called plaintiff several times a week, frequently more than once a day, visited plaintiff's home one or more times a week, and called plaintiff at the hospital while her daughter was seriously ill even after plaintiff had requested that defendant refrain from bothering her at the hospital. Defendant further induced plaintiff to draft a check, promising that the check would not be processed. Instead, the defendant immediately phoned and informed an acquaintance of the plaintiff that she was writing bad checks. Lastly, defendant's employee used plaintiff's phone to call in to the company to describe and report the items in plaintiff's home and at the same time refused to leave plaintiff's home

until her son arrived.

The *Davis* court stated that defendant's conduct was not of such an extreme and outrageous nature to warrant recovery for intentional infliction of severe emotional distress. The court reasoned that the plaintiff was legally obligated to pay the debt, and that where a creditor is doing no more than insisting upon his legal rights, he must be given some latitude to pursue collection of the debt even though it may cause some "inconvenience, embarrassment or annoyance to the debtor." (*Davis,* 66 Ill. 2d at 92, 360 N.E.2d at 768.) There was also no evidence regarding what was said by the agents of defendant who were making the calls and visits to plaintiff at her home and at the hospital which indicated those calls and visits were outrageous. As to the allegation regarding the bad check, the court considered the action as only one isolated event which could be considered extreme or outrageous and refused to invoke liability for a single impermissible act. *Davis*, 66 Ill. 2d at 93, 360 N.E.2d at 769.

■ In *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373, this court concisely stated the elements for intentional infliction of emotional distress as:

"(1) extreme and outrageous conduct, (2) intent by the defendant to cause, or a reckless disregard of the probability of causing emotional distress, (3) severe or extreme emotional distress suffered by the plaintiff, and (4) an actual and proximate causation of emotional distress by the defendant's outrageous conduct." *Debolt*, 56 Ill. App. 3d at 113, 371 N.E.2d at 375.

■ As in the present case, *Debolt* was before this court on defendant's motion to dismiss. This court noted that a motion to dismiss admits all well-pleaded facts as well as all reasonable inferences drawn therefrom, but such motion does not admit conclusions of law or fact unsupported by allegations of specific facts. (*Debolt*, 56 Ill. App. 3d at 113, 371 N.E.2d at 375, citing *Pierce v. Board of Education* (1976), 44 Ill. App. 3d 324, 358 N.E.2d 67.) Therefore, the court stripped the complaint of all conclusory statements and determined that the specific facts alleged could not be interpreted as outrageous conduct on the part of the defendant. (*Debolt*, 56 Ill. App. 3d at 113, 371 N.E.2d at 375-76.) Numerous other courts have dealt with the tort of intentional infliction of emotional distress. However, the type of conduct and the elements of the tort as cited, respectively, in *Davis* and *Debolt* are consistent with all other cases we have reviewed.

Complicating our consideration of this cause of action is the recent United States Supreme Court decision in *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876,

wherein the Supreme Court added an additional element to the tort of intentional infliction of emotional distress in what we believe are limited circumstances.

In *Hustler Magazine*, the respondent Jerry Falwell filed a diversity action in Federal district court against petitioners, a nationally circulated magazine and its publisher, to recover damage for invasion of privacy, libel, and intentional infliction of emotional distress, arising from petitioner's publication of an ad "parody" which portrayed respondent as having engaged in a drunken, incestuous rendezvous with his mother in an outhouse. The district court directed a verdict for petitioners on the privacy claim and the jury found for petitioners on the libel claim, but found for respondent on the claim of intentional infliction of emotional distress. (*Hustler Magazine*, 485 U.S. at ____, 99 L. Ed. 2d at 47, 108 S. Ct. at 877-78.) The issue before the court was whether the jury's award was consistent with the first and fourteenth amendments of the United States Constitution.

The jury found that the ad "parody" could not "reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated." (*Hustler Magazine*, 485 U.S. at ____, 99 L. Ed. 2d at 47, 108 S. Ct. at 878.) It was undisputed that respondent was a "public figure" for purposes of first amendment law. *Hustler Magazine*, 485 U.S. at ____, 99 L. Ed. 2d at 53, 108 S. Ct. at 882.

The court held:

> "We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a 'blind application' of the *New York Times* standard [*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710], see *Time, Inc. v. Hill*, 385 U.S. 374, 390, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967), it reflects our considered judgment that such a standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler Magazine*, 485 U.S. at ____, 99 L. Ed. 2d at 52-53, 108 S. Ct. at 882.

Defendant asserts that *Hustler Magazine* is controlling for resolution of this issue. We disagree for two reasons. First, *Hustler Magazine* concerned the publication of an ad parody as the sole basis for respondent's claim of severe emotional distress. Although arguably

the two posters at issue in the present case can be compared to the ad parody in *Hustler Magazine*, defendant in the present case did much more than distribute posters. Therefore, even if the posters in the present case can be considered privileged speech under the first amendment and excluded under the holding of *Hustler Magazine*, defendant has committed other tortious acts for which we can find no constitutional privilege. Such acts warrant our consideration whether a jury could find that defendant's conduct was outrageous beyond the bounds of decency.

■■ Second, the court in *Hustler Magazine* was clear in its holding that only public officials and public figures may not recover for intentional infliction of emotional distress based upon publications such as ad parodies without satisfying the *New York Times* standard of actual malice. In our view, the present case does not concern a public official, nor does it concern public figures as that status has been defined by the Supreme Court, as those who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." (*Associated Press v. Walker*, decided with *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 164, 18 L. Ed. 2d 1094, 1116, 87 S. Ct. 1975, 1996.) Moreover, instances of involuntary public figures are exceedingly rare.

> "For the most part those who attain [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Gertz v. Welch* (1974), 418 U.S. 323, 345, 41 L. Ed. 2d 789, 808, 94 S. Ct. 2997, 3009.

■■ We do not consider plaintiff a public figure in this case merely because of her status as the executive director of an abortion clinic. Although she must apparently be a pro-choice advocate, we do not consider her as being in a position to influence society. Likewise, we disagree with defendant's position that plaintiff is still subject to the actual malice standard because she is involved in an issue of public interest or concern. In *Gertz v. Welch* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, the Supreme Court left to the individual States the decision as to whether the *New York Times* standard should be applied to defamers of private individuals involved in matters of public concern so long as the States do not impose liability

without fault. (*Gertz*, 418 U.S. at 346, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010.) Accordingly, in *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292, the Illinois Supreme Court stated that "[t]o extend the *New York Times* standard to statements falling in the public interest category would thus reduce materially the scope of the protection afforded the private individual." (*Troman*, 62 Ill. 2d at 196, 340 N.E.2d at 297.) Therefore, the court held that "negligence may form the basis of liability regardless of whether or not the publication in question related to a matter of public or general interest." *Troman*, 62 Ill. 2d at 198, 340 N.E.2d at 299.

Although the *Troman* standard has been eroded somewhat in limited circumstances (see, *e.g.*, *Colson v. Stieg* (1982), 89 Ill. 2d 205, 433 N.E.2d 246), we believe the negligence standard, rather than actual malice, is applicable to the present situation.

■ Thus, having determined that plaintiff herein need not meet the actual malice standard as did respondent in *Hustler Magazine*, the logical inquiry is whether *Hustler Magazine* should be read broadly enough to require some additional element for private plaintiffs to meet when publications are either wholly or in part the basis for such plaintiff's claims for intentional infliction of emotional distress. In other words, must plaintiff herein additionally show that the posters contained a false statement of fact which the defendant either knew was false or, believing it to be true, lacked reasonable grounds for that belief? We think not. Our review of *Hustler Magazine* leads us to believe that the court's primary concern was with public officials and public figures. Nowhere did the court indicate that its holding applied to private individuals. Although we do not discount defendant's right to free speech under the first amendment, we do not read *Hustler Magazine* as requiring proof of an additional element to the tort of intentional infliction of emotional distress where the plaintiff is a private individual. Therefore, we consider it proper to take into account the posters and surrounding circumstances when determining if defendant's conduct was sufficiently outrageous to cause plaintiff to suffer severe emotional distress.

■ If the only alleged actions were the contents and distribution of the two posters, we would be inclined to affirm the trial court's dismissal. However, the distribution of the posters is just the last in a series of events that has spanned a two-year period. We find it particularly bothersome that defendant, a seemingly well-educated person, would stoop to following, in his car, plaintiff while she was driving her car and to confronting plaintiff at the airport and preventing her ingress and egress. We believe this type of behavior, compounded with

the other acts alleged, is worthy of a jury's consideration whether · defendant is liable for the intentional infliction of emotional distress. Although we acknowledge that plaintiff has a position in a highly controversial enterprise, we consider defendant's acts are subject to being viewed as directed at plaintiff personally, not the subject matter of plaintiff's occupation.

■ We further believe that plaintiff has sufficiently alleged that she suffered severe emotional distress. Plaintiff alleges, among other things: that she was treated at a hospital for her physical and emotional condition of ill-being; that she was under a doctor's care for two months; that she could not work for several days; that she could not sleep for several days; and that all of this was a direct and proximate result of defendant's conduct. "It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." Restatement (Second) of Torts §46, comment *j* (1965).

Taken as true for purposes of a motion to dismiss under section 2—615, plaintiff has alleged sufficient facts upon which a jury could find that defendant's conduct was sufficiently outrageous to be beyond the bounds of decency and that plaintiff suffered emotional distress such that "no reasonable man could be expected to endure it." Restatement (Second) of Torts §46, comment *j* (1965); see also *Public Finance Corp. v. Davis*, 66 Ill. 2d at 90, 360 N.E.2d at 767.

We therefore reverse and remand the trial court's dismissal of plaintiff's second amended count I consistent with this opinion, but reserve for the trial court the discretion to strike any allegations not in conformance with pleading requirements.

Plaintiff's second amended count II and amended count IV both alleged causes of action for libel. Second amended count II alleged negligence in that defendant either knew said statements contained within the two posters were false; should have known in exercise of ordinary care that said statements in said posters were false; lacked reasonable grounds for believing said statements were true; or made no investigation as to the truth of the statements contained in said posters. Amended count IV alleged that defendant caused the posters to be distributed with actual malice in that defendant either knew said statements contained in said posters were false, or caused the posters to be distributed containing false statements with reckless disregard as to whether said statements were false. At all times, plaintiff alleged she was a private person and therefore need only show defendant was negligent. However, plaintiff acknowledged that she must show actual malice on the part of defendant to recover punitive

damages. See *Gertz v. Welch*, 418 U.S. at 349, 41 L. Ed. 2d at 810, 94 S. Ct. at 3011.

██ █ Generally, defamation, which consists of the identically treated branches of libel and slander, is the publication of anything injurious to the good name or reputation of another, or which tends to bring him into disrepute. (*Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482.) Illinois courts have held that a statement is defamatory if it impeaches a person's integrity, virtue, human decency, respect for others, or reputation and thereby lowers that person in the estimation of the community or deters third parties from dealing with that person. (*Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 397 N.E.2d 41.) Each defamation case must be decided on its own facts. (*Bruck v. Cincotta* (1977), 56 Ill. App. 3d 260, 371 N.E.2d 874.) Defamatory words, however, are divided into two classes: those actionable *per se* and those actionable *per quod*. (*Harris Trust & Savings Bank v. Phillips* (1987), 154 Ill. App. 3d 574, 506 N.E.2d 1370; *Cook v. East Shore Newspapers, Inc.* (1945), 327 Ill. App. 559, 64 N.E.2d 751.) Words defamatory *per se* are those so obviously and naturally harmful to the subject, that proof of their injurious character can be, and is, dispensed with. (*Owen v. Carr* (1986), 113 Ill. 2d 273, 492 N.E.2d 1145; *Harris Trust*, 154 Ill. App. 3d at 578-79, 506 N.E.2d at 1373.) *Per se* defamation has been found where words "impute: (1) commission of a criminal offense; (2) infection with a communicable disease; (3) inability to perform, or want of integrity to discharge duties of office or employment; and (4) prejudicing a particular party in his trade, profession or calling." (*Harris Trust*, 154 Ill. App. 3d at 580, 506 N.E.2d at 1374, citing *Catalano v. Pechous* (1978), 69 Ill. App. 3d 797, 805, 387 N.E.2d 714, *aff'd* (1980), 83 Ill. 2d 146, 419 N.E.2d 350, *cert. denied* (1981), 451 U.S. 911, 68 L. Ed. 2d 300, 101 S. Ct. 1981.) Words not falling into the categories otherwise attributable to libel *per se* may be actionable *per quod* if they are actually defamatory and specific damage is alleged. (*American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 435 N.E.2d 1297.) Libel *per quod* requires extrinsic facts and innuendo to give it defamatory meaning. (*Bruck v. Cincotta*, 56 Ill. App. 3d at 260, 371 N.E.2d at 874.) To sustain an action of libel *per quod*, plaintiff must allege and prove special damages. *Whitby v. Associates Discount Corp.*, 59 Ill. App. 2d 337, 207 N.E.2d 482.

Plaintiff maintains that the "Wanted" poster, when read alone, or in conjunction with the "Face The American Holocaust" poster, contains false statements of fact that are libelous *per se*. In particular,

plaintiff argues that defendant's use of the word "killing" would cause the average reader to believe that plaintiff has committed a criminal offense. Alternatively, plaintiff argues that defendant's statements are libelous *per quod*.

■■ ■ We acknowledge, however, that the Supreme Court has recognized a constitutional privilege for expressions of opinion. (*Gertz v. Welch*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997; see also *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145.) Whether a statement is one of opinion or fact is a matter of law. (*Owen*, 113 Ill. 2d at 280, 497 N.E.2d at 1148; *Lewis v. Time, Inc.* (9th Cir. 1983), 710 F.2d 549.) Moreover, the alleged defamatory language must be considered in context to determine whether or not it is an expression of opinion. (*Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770; *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970; *Owen*, 113 Ill. 2d at 280, 497 N.E.2d at 1148.) We further consider it proper to determine whether alleged defamatory statements are expressions of opinion pursuant to a section 2—615 motion to dismiss for failure to state a cause of action.

In *Ollman v. Evans*, the court drew upon theories used in prior cases to devise the totality of the circumstances analysis for determining whether a publication is a statement of fact or an expression of opinion. The four-part analysis is explained as follows:

"First, we will analyze the common usage or meaning of the specific language of the challenged statement itself. Our analysis of the specific language under scrutiny will be aimed at determining whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. See *Buckley v. Littell*, 539 F.2d 882, 895 (2d Cir. 1976), cert. denied, 429 U.S. 1062, 97 S. Ct. 785, 50 L. Ed. 2d 777 (1977). Readers are, in our judgment, considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning. Second, we will consider the statement's verifiability—is the statement capable of being objectively characterized as true or false? See, e.g., *Hotchner v. Castillo-Puche*, supra, 551 F.2d at 913. Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content. And, in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything

but speculation. Third, moving from the challenged language itself, we will consider the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content. See *Greenbelt Cooperative Publishing Association v. Bresler*, supra, 398 U.S. at 13-14, 90 S. Ct. at 1541; *cf.* Restatement (Second) of Torts, §563. Finally, we will consider the broader context or setting in which the statement appears. Different types of writing have, as we shall more fully see, widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion. See *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, supra, 418 U.S. at 286, 94 S. Ct. at 2782." *Ollman v. Evans*, 750 F.2d at 979.

 We believe defendant's statement that plaintiff is involved in "killing" can be commonly understood as meaning that plaintiff has terminated a life of something or someone that was previously living. In itself the accusation that plaintiff is involved with "killing the unwanted and unprotected" is a potentially damaging fact. Our difficulty, however, is that the type of killing being referred to in this instance is not, in our opinion, objectively capable of being proven or disproven. This is especially true when the allegedly defamatory statements are read in the context in which the statements occur. It becomes apparent when looking at the "Wanted" poster in its entirety that defendant's use of the word "killing" is his description of what takes place during an abortion procedure. We are not prepared to find that the word "killing" in this context is verifiable and, thus, a defamatory statement of fact. Additionally, when the statements are considered within the social context, it becomes quite clear that defendant's use of the word "killing" merely describes his opinion of the results of an abortion procedure. Since the Supreme Court decision of *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, wherein a woman's right to have an abortion was determined to be constitutionally protected, one of the primary issues has been, and still is, whether or not there is an actual killing of a human life as the result of an abortion. Pro-life activists certainly maintain that abortion is a killing; however, pro-choice activists believe the contrary, especially before the fetus has reached viability. Regardless of which position may ultimately be considered correct, at the present we find that the average reasonable reader of the "Wanted" poster would not believe as an actual fact that plaintiff has been involved in killing, as

that word is commonly understood by our society. In fact, we believe that the average reader would quickly realize that the central theme of the "Wanted" poster is that abortion is a killing, to which plaintiff plays a part, and should be a crime in the opinion of those siding with the pro-life movement.

Although we consider the "Wanted" poster repulsive, explicit, unnecessary and in bad taste, we adhere to the belief that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz v. Welch*, 418 U.S. at 339-40, 41 L. Ed. 2d 805, 94 S. Ct. at 3007.) As elaboration, we cite *Sloan v. Hatton*, wherein the court stated:

> "Free speech is not restricted to compliments. Were this not so there could be no verbal give and take, no meaningful exchange of ideas, and we would be forced to confine ourselves to platitudes and compliments. But members of a free society must be able to express candid opinions and make personal judgments. And those opinions and judgment may be harsh or critical—even abusive—yet still not subject the speaker or writer to civil liability." *Sloan v. Hatton* (1978), 66 Ill. App. 3d 41, 42, 383 N.E.2d 259, 260.

We consider the above rationale applicable to all the other allegedly defamatory statements with the exception of the allegedly false statement that plaintiff performs abortions on 29-week gestationally old fetuses. This alleged statement requires reading the two posters in conjunction. In this regard we perceive plaintiff's reasoning to be that the two posters were distributed at the same time; therefore, the average reader would look at the pictures of apparently aborted fetuses on the "Face The American Holocaust" poster and infer that plaintiff was involved with abortions involving fetuses as old as 29 weeks gestationally. Without more information, we note that an abortion at 29 weeks may be a crime. (Ill. Rev. Stat. 1987, ch. 38, par. 81—21 *et seq.*) Our reading of the amended complaint, which incorporates the two posters by reference, does not result in the inference that plaintiff is suggesting. Only well-pleaded facts are admitted by a section 2—615 motion to dismiss and it is commonly understood that attached exhibits supercede any inconsistent allegations of a complaint. (*Outboard Marine Corp. v. James Chisolm & Sons, Inc.* (1985), 133 Ill. App. 3d 238, 478 N.E.2d 651.) Accordingly, we find the allegation that defendant stated that plaintiff performs abortions on 29-week gestationally old fetuses is inconsistent with the attached ex-

hibits for two reasons. First, there is absolutely no cross-referencing between the two posters which would lead the average reader to infer that the two posters should be read and considered together. Second, the "Face The American Holocaust" poster tells the story of how 17,000 fetuses were found in a 3½-ton container in Los Angeles, California. Nowhere does it state that plaintiff was responsible for any of the fetuses found in the container.

 Plaintiff further argues that an expression of an opinion that does not disclose the facts forming the basis for the speaker's opinion may be actionable. Section 566 of the Restatement (Second) of Torts, captioned "Expression of Opinion," states the following:

> "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." (Restatement (Second) of Torts, §566 (1977).)

Section 566 has been cited approvingly in Illinois. See *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, 503 N.E.2d 580; *O'Donnell v. Field Enterprises, Inc.* (1986), 145 Ill. App. 3d 1032, 491 N.E.2d 1212.

We do not consider the rationale of section 566 applicable to this case. The average reasonable reader would realize that the "Wanted" poster is referring to the practice of abortion and that the basis for defendant's opinion that plaintiff is "killing for profit the unwanted and unprotected" is that plaintiff is somehow involved in the abortion process. Moreover, the average reader of the "Wanted" poster would recognize that it is merely another restatement of the pro-life movement's opinion regarding abortion; an opinion that has been publicized since at least the *Roe v. Wade* decision in 1973. The "Wanted" poster does not imply that plaintiff has been involved in any "killing for profit" outside of her involvement with abortions. The "Face The American Holocaust" poster simply does not refer to plaintiff and cannot be read in conjunction with the "Wanted" poster for reasons previously stated.

Accordingly, we affirm the trial court's dismissal of plaintiff's second amended count II and amended count IV. Plaintiff has not pleaded facts sufficient to state a cause of action for defamation.

Count III of plaintiff's original complaint alleged a cause of action against defendant for invasion of privacy (false light). By order dated July 15, 1986, the trial court dismissed plaintiff's count III with prejudice based on this court's decision in *Melvin v. Burling* (1986), 141 Ill. App. 3d 786, 490 N.E.2d 1011.

■■ In *Melvin*, this court stated, in *dicta*, that "the false light area of privacy law has not, as yet, been judicially accepted in Illinois as a cause of action." (*Melvin*, 141 Ill. App. 3d at 787-88, 490 N.E.2d at 1012.) Since *Melvin*, the Appellate Court for the First District, Fourth Division, in *Berkos v. National Broadcasting Co.* (1987), 161 Ill. App. 3d 476, 515 N.E.2d 668, recognized a false light invasion of privacy claim. Quoting the Restatement (Second) of the Law of Torts, the court stated that a complaint for such a claim must allege facts tending to show the following:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Berkos*, 161 Ill. App. 3d at 496, 515 N.E.2d at 680, quoting Restatement (Second) of Torts §652E (1977).

■■ Plaintiff's complaint alleges a cause of action in negligence. Nonetheless, plaintiff argues that *Berkos* is not controlling because that case involved a public official plaintiff and a media defendant and the *New York Times* actual malice standard applied, whereas, the instant case involves a dispute between two private individuals and thus plaintiff need only satisfy the negligence standard enunciated in *Gertz v. Welch*. We disagree. The principal case for attaching first amendment privileges to invasion of privacy claims was *Time, Inc. v. Hill* (1967), 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534. In *Time, Inc. v. Hill*, the Supreme Court held that a private plaintiff must satisfy the *New York Times* actual malice standard when the alleged falsehood is a matter of public concern. (*Time, Inc. v. Hill*, 385 U.S. at 390, 17 L. Ed. 2d at 468, 87 S. Ct. at 543.) We likewise consider abortion to be a matter of public concern and, thus, consider *Time, Inc. v. Hill* applicable. Moreover, in *Gertz*, the court specifically excluded the *Time, Inc. v. Hill* decision as outside the scope of its consideration. (*Gertz*, 418 U.S. at 348, 41 L. Ed. 2d at 810, 94 S. Ct. at 3011.) Therefore, we believe the elements for a cause of action for a false-light invasion-of-privacy claim as stated by the restatements and cited by *Berkos* are accurate reflections of the law.

Inasmuch as count III of plaintiff's complaint does not allege malice on the part of defendant, the trial court's dismissal of plaintiff's count III is affirmed.

Finally, defendant made a motion to dismiss appeal alleging that plaintiff failed to argue in her brief the question of whether defendant's statements were privileged. Defendant's motion is denied.

For all of the foregoing reasons, the judgment of the circuit court of Peoria County is reversed and remanded consistent with this opinion as to plaintiff's second amended count I, and affirmed as to plaintiff's second amended count II, count III and amended count IV.

Affirmed in part; reversed in part and remanded.

STOUDER, P.J., and HEIPLE, J., concur.